LASKER, District Judge.
 

 On March 5, 1981, the board of directors of Amax, Inc. (“Amax”) announced publicly that Standard Oil of California, Inc. (“So-cal”) had made a proposal, conditioned on approval of the Amax board, to acquire the equity interest in Amax not already owned by Socal at a price of approximately $78.50 a share, nearly double the then-current market price of $38.50 per share. The total value of Socal’s offer was approximately four billion dollars, making it the largest takeover bid in history at the time it was announced. Simultaneous with the announcement of the proposal, the Amax board announced its decision to reject the offer. When the market opened on March 6th, after the temporary halt in trading that accompanied the announcement, the market price of Amax stock rose approximately eighteen points and the price of the most heavily traded series of Amax options rose substantially.
 

 O’Connor & Associates (“O’Connor”) trades stock and options for its own account. Between February 23, 1981, and March 6,1981, O’Connor sold call options on Amax stock. On March 10, 1981, O’Connor commenced this action, alleging that unknown insiders at either Socal or Amax or both had “tipped” inside information concerning the Socal takeover bid to unknown customers and registered representatives of Dean Witter Reynolds, Inc. (“DWRI”) and A.G. Becker, Inc. (“Becker”), and that the customers and registered representatives had purchased Amax call options prior to March 6, 1981, with knowledge of the proposed merger. In addition, O’Connor alleges that DWRI and Becker substantially assisted its customers with knowledge that or in reckless disregard of whether the customers were trading on the basis of material, nonpublic information. O’Connor claims that it is entitled to relief under sections 10(b) and 14(e) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(e), Rules 10b-5 and 14e-3 of the Securities and Exchange Commission (“SEC”), 17 C.F.R. §§ 240.10b-5 and 204.14e-3, and under common law fraud principles.
 
 [1]
 

 On March Í0,1981, O’Connor was granted a temporary restraining order preventing DWRI and Becker from distributing any profits realized from purchases of Amax call options in the two weeks immediately preceding the public announcement of So-cal’s takeover proposal. DWRI and Becker
 
 *1177
 
 were also directed to furnish O’Connor with the names of all those who had made purchases of Amax call options beyond a threshold amount in the period immediately preceding the public announcement, with the understanding that the restraining order would be lifted if O’Connor was unable to demonstrate that the buyers of the Amax call options were not financially responsible or were not within the jurisdiction of the court. On March 16, 1981, after DWRI and Becker made the required disclosures, O’Connor amended its complaint and named as defendants the DWRI customers and 12 DWRI employees and a customer and three registered representatives of Becker whose names had been disclosed. In addition, O’Connor moved for an order of attachment. When O’Connor was unable to demonstrate its entitlement to an attachment, its motion was denied and the restraining order was lifted.
 

 DWRI, on behalf of itself and several of its employees,
 
 [2]
 
 Amax, Becker, on behalf of itself and two employees,
 
 [3]
 
 Cynthia Smith and William Goldberg now move to dismiss the complaint. For the sake of clarity, we consider motions presenting common issues together.
 

 I.
 

 William M. Goldberg, a registered representative of Becker, Cynthia Smith, a customer of DWRI, and Becker, move to dismiss the complaint pursuant to Fed.R. Civ.Pr. 12(b)(6) on the ground that the complaint fails to state a claim under either § 10(b) of the Securities Exchange Act or § 14(e) of the Williams Act because it does not allege a fiduciary relationship between themselves and O’Connor.
 

 The thrust of the argument is that, because O’Connor traded in options rather than the actual sharps of Amax, the insiders did not stand in a fiduciary relationship with O’Connor. Relying on the Supreme Court’s opinion in
 
 Chiarella v. United
 
 States, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980), defendants emphasize that trading on the basis of material, nonpublic information constitutes a fraudulent practice under the securities laws only if there exists a special relationship between the alleged wrongdoer and the sellers of the security that could give rise to a duty to disclose. They argue that such a duty does not arise in such impersonal market transactions as alleged here because corporate insiders owe fiduciary duties only to the shareholders of the corporation, not to options traders involved in arm’s length transactions who are each betting on the future movement of the underlying stock. Accordingly, it is claimed, the only persons to whom alleged tippees of the corporate insiders owe a duty not to trade on such information are the shareholders of the corporation. Moreover, the defendants assert that there is no precedent for an options trader to maintain a suit against corporate insiders under §§ 10(b) or 14(e) of the Securities Exchange Act and that extending a corporate insiders’ duties to options traders would vastly expand the potential liability under the Securities Act of the corporation, its directors, officers and employees to a broad and increasing category of investors with which the corporation has no relationship. Finally, it is argued that options trading is an inherently high-risk form of trading involving the possibility of huge gains and losses and that, since the corporation and its officers, directors and employees have no control over such trading, they should not be considered to have fiduciary duties of disclosure to option traders.
 

 O’Connor responds that since options are “securities” as defined by the Securities Exchange Act, 15 U.S.C. § 78c(a)(10), the prohibitions of § 10(b) against fraudulent conduct in connection with a sale or purchase of a security are properly applied to options transactions. Moreover, O’Connor contends
 
 *1178
 
 that the increasing volume of options trading supports rather than undercuts the applicability of the investor protections contained in the 1934 Act. Although options trading is a somewhat risky market transaction, O’Connor maintains that there is no rational basis for exposing options traders to the
 
 additional
 
 risk of loss caused by fraudulent conduct on the part of others in the market.
 

 O’Connor emphasizes that the risk involved in options trading is a direct function of the price movements of the underlying stock and that options traders therefore stand in the same functional position vis a vis information concerning the corporation’s fortunes as those who trade in corporate stock itself. O’Connor further asserts that the options writer is either a holder of the security at the time he enters into the options contract (covered options) or obligates himself to purchase the security (naked options), and therefore is owed fiduciary duties by corporate insiders to the same extent as shareholders. O’Connor argues that-to exempt options trading from the coverage of § 10(b) would be to create a gaping loophole in the securities laws for unscrupulous insiders who could thereby trade in options instead of the underlying stock and thus avoid the prohibitions on insider trading.
 

 O’Connor contends that
 
 Chiarella
 
 did not alter the basic duty of corporate insiders and their tippees to disclose or abstain from trading when they possess material, nonpublic information. According to O’Connor, the duty to disclose which the
 
 Chiarella
 
 opinion found to be critical to a 10(b) violation based on a failure to speak is imposed on corporate insiders because of their position of trust and confidence with respect to purchasers and sellers of the securities of the corporation. Thus, O’Connor argues, the insiders of Amax or Socal and their tippees owed a duty to disclose, or to abstain from trading, not only to shareholders, but also to those who trade in other securities of the corporation, including options.
 

 Defendants reply that their argument is not based on the proposition that an option is not a security or that investors may not bring an action when there has been a fraudulent, deceptive or manipulative practice in connection with the sale of an option, but rather that there can only be a fraud in an omission case when a duty to disclose arises from a confidential relationship. O’Connor’s position, according to defendants, would constitute a holding that the possessor of material, nonpublic information comes under a duty to disclose or obtain from the mere fact that he possesses the information, the very proposition rejected in
 
 Chiarella.
 

 II.
 

 Corporate officers and directors owe fiduciary düties to the corporation and its shareholders to administer their duties for the common good of all the shareholders.
 
 See Pepper
 
 v.
 
 Litton,
 
 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). This fiduciary duty arises from the fact that shareholders are owners of the corporation and they expect to share in its profits. When a director or officer benefits himself at the expense of the corporation, he breaches his duty to the shareholders by preventing them from realizing their expectation to share fairly in the corporate fortunes.
 
 Pepper v. Litton, supra
 
 at 306, 60 S.Ct. at 245, 84 L.Ed. 281 (1939). The special relationship between the shareholders and the officers and directors results from the fact that the shareholders have entrusted their equity to the management of corporate enterprise. They thus have a vested interest in the fortunes of the corporation and concomitant voting rights to decide how the corporation should be run. In the event the corporate insider breaches his fiduciary duty, they may bring suit in the name of the corporation itself to make the corporation, and indirectly themselves, whole.
 

 The relationship between corporate insiders and shareholders stands in stark contrast to the lack of relationship between the corporate insiders and options traders. While it is true that shareholders and options traders both rely on the fortunes of corporations, the dispositive distinction is
 
 *1179
 
 that the options trader has no equity interest in the corporation by virtue of his selling or purchasing an option on the corporation’s stock. He is owed no special duty by the officers and directors of the corporation because, quite simply, the corporation is not run for his benefit. He has contributed no equity to the corporation and, in the event of insider wrongdoing, he has no right to bring suit to make the corporation whole. Moreover, while the option writer may obligate himself in the future to purchase shares of the corporation (in the event a “naked option”' is exercised), this purchase is solely for the purpose of turning the shares over to the other contractual party, not for the purpose of investing in the fortunes of the corporation. Whatever relationship this may create with the corporation, it cannot be said that it rises to the level of a relationship of trust and confidence between the options trader and the corporate insider. In short, as a shareholder one is entitled to the benefits of a trust relationship. As an options trader, one is not.
 

 Nevertheless while the defendants’ position that they owed no fiduciary duties to O’Connor is correct, their argument that the securities laws are not violated by insider (and tippee) trading on the basis of material, nonpublic information unless the insider (the tippee) owes a fiduciary duty to those with whom he trades has been undercut by the Court of Appeals’ recent decision in
 
 United States v. Newman,
 
 664 F.2d 12 (2d Cir. 1981). In
 
 Newman,
 
 the indictment charged that two employees of the investment banking firm of Morgan Stanley & Co., Inc. and Kuhn Loeb & Co. misappropriated confidential information concerning proposed mergers and acquisitions which had been entrusted to their employers by their corporate clients. They allegedly passed the information along to Newman, who in turn shared the information with two others. The three then allegedly purchased stock in the companies that were merger and takeover targets of the clients of Morgan Stanley and Kuhn Loeb. In considering whether the indictment charged a violation of § 10(b), the Court of Appeals noted that
 
 Chiarella
 
 had left open the issue whether Rule 10b-5 is violated when the conduct alleged constitutes a fraud upon the clients of the trader’s employer but when no duty is owed to those with whom the trader deals. In
 
 Chiarella,
 
 that proposition was not considered because the Court found that it had not been sufficiently presented to the jury and therefore could not provide the basis for criminal liability. In
 
 Newman,
 
 however, the government charged that the conduct of the tippers and tippees constituted a breach of fiduciary duties owed to the tippers’ employers, their employers’ clients, and their shareholders. The Court of Appeals found that the alleged conduct constituted a breach of those fiduciary duties and that, since “the appellee’s sole purchase in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies,”
 
 Id.
 
 at 18, the fraud was “in connection with the purchase or sale of securities” under Rule 10b — 5 and therefore violated the rule.
 

 Applying
 
 Newman to
 
 the facts of this case, we conclude that the complaint sufficiently alleges fraudulent conduct in violation of the securities laws. The insiders of Socal and Amax owed a fiduciary duty to their respective corporations not to trade on the basis of inside information or to tip that information to others. They allegedly breached those duties when the insiders or their tippees purchased call options on Amax stock. Just as the insiders owed no fiduciary duty to the persons with whom they traded in
 
 Newman,
 
 the insiders here may have owed no fiduciary duty to the writers of call options. Nevertheless, under the
 
 Newman
 
 rationale, because their trading or tipping breached fiduciary duties owed to other parties, the alleged conduct constituted a fraudulent practice within the meaning of the securities laws.
 

 Since the complaint alleges fraudulent practices in violation of the securities laws, the narrow issue presented by this motion and left open by the court in
 
 Newman
 
 is whether O’Connor, as a party to
 
 *1180
 
 whom no fiduciary duty was owed, nevertheless has standing to assert a civil claim for damages allegedly resulting from defendants’ breaches of fiduciary duties owed to other persons. We hold that it does.
 

 While O’Connor was owed no fiduciary duties by the insiders of the corporation, it is a seller of a “security” within the meaning of Rule 10b-5. Section 3(a)(13) of the Securities Exchange Act provides that “[t]he terms ‘buy’ and ‘purchase’ each include any contract to buy, purchase, and otherwise acquire.” Section 3(a)(14) provides that “[t]he terms ‘sale’ and ‘sell’ include any contract to sell or otherwise dispose of.” For the purposes of Rule 10b-5, “the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as ‘purchasers’ and ‘sellers’ of securities . . . because the definitional provisions of the 1934 Act themselves grant them such a status.”
 
 Blue Chip Stamps v. Manor Drug Stores,
 
 421 U.S. 723, 751, 95 S.Ct. 1917, 1932-33, 44 L.Ed.2d 539 (1975). Thus, the fact that O’Connor is an options trader, rather than a shareholder of a corporation, is not in itself a bar to this suit. In addition, O’Connor is within the scope of the statute’s and the Rule’s intended beneficiaries. Section 10(b) makes it “unlawful for any person ... to use or employ, in connection with the purchase or sale of any security .. . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . .. for the protection of investors.”
 
 [4]
 
 Rule 10b-5 is similarly framed to ban fraudulent or deceptive practices “in connection with the purchase or sale of any security.”
 
 [5]
 
 Furthermore, O’Connor alleges direct injury as a result of the fraudulent practices and alleges that it actually sold securities in connection with the alleged fraudulent practices. O’Connor has therefore satisfied the standing requirements traditionally associated with private actions brought under § 10(b) and Rule 10b-5.
 
 See, eg., Blue Chip Stamps v. Manor Drug Stores, supra; Wilson v. Com tech Telecommunications Corp.,
 
 648 F.2d 88 (2d Cir. 1981);
 
 Elkind v. Liggett & Myers, Inc.,
 
 635 F.2d 156, 165 (2d Cir. 1980);
 
 Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 495 F.2d 228 (2d Cir. 1974).
 

 Defendants argue that the
 
 Chiarella
 
 Court, by requiring that the alleged wrongdoer have violated a fiduciary duty before a violation of Rule 10b-5 may be found, implicitly altered the requirements of standing. The proposition is unsound. The
 
 Chiarella
 
 Court considered a criminal conviction under Rule 10b-5, not a civil action, and thus did not purport to rule on the requirements for civil standing once a violation of the Rule is in fact alleged. Moreover, a brief perusal of the background to the application of the “disclose or abstain” duty considered in
 
 Chiarella
 
 does not support the conclusion that those investors to whom the “disclose or abstain” duty was owed do not have standing to recover for injuries resulting from violations of the Rule.
 

 
 *1181
 
 In
 
 SEC v. Texas Gulf Sulphur Co.,
 
 401 F.2d 833 (2d Cir. 1968),
 
 cert. denied sub nom., Kline v. SEC,
 
 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Court of Appeals held that a corporate insider “in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it . . ., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed.”
 
 Id.
 
 at 848. In
 
 Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,
 
 this “disclose or abstain” duty was held to apply in private damage actions under § 10(b) and Rule 10b-5.
 
 Chiarella,
 
 however, was neither a corporate insider nor a tippee of a corporate insider. He learned of the inside information by decoding documents which had been delivered to his printing shop. At his trial, the jury was instructed that the possession of material, nonpublic information itself triggered the “disclose or abstain” duty. The Court of Appeals affirmed the conviction “holding that
 
 ‘[ajnyone
 
 — corporate insider or not — who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose.’ ”
 
 Chiarella v. United States, supra
 
 445 U.S. at 231, 100 S.Ct. at 1116,
 
 quoting
 
 588 F.2d 1358, 1365 (2d Cir. 1978). In reversing the conviction, the Supreme Court held that “a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information,”
 
 Chiarella v. United States, supra
 
 at 235, 100 S.Ct. at 1118, but rather depends “on a relationship of trust and confidence,”
 
 id.
 
 at 230, 100 S.Ct. at 1115.
 

 In the present case, in contrast to
 
 Chiarella,
 
 it is alleged that corporate insiders were the source of the material, inside information. There was no question in
 
 Chiarella
 
 that “[application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder’s welfare before their own, will not benefit personally through fraudulent use of material, nonpublic information,”
 
 id.
 
 at 230, 100 S.Ct. at 1115 (footnote omitted), and that “ ‘[t]ippees’ of corporate insiders . . . have a duty not to profit from the use of inside information that they know or should know came from a corporate insider,”
 
 id.
 
 at 230 n. 12, 100 S.Ct. at 1115, 1116 n. 12,
 
 citing Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra
 
 at 237-38. Consequently, by virtue of their
 
 fiduciary
 
 duty to the corporation and its shareholders, corporate insiders become subject to the
 
 separate
 
 duty to either “abstain or disclose.” Unlike the fiduciary duty, which is owed only to the corporation and its shareholders, this additional duty to disclose is owed “to the investing public,”
 
 Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra
 
 at 240, “to those investors trading contemporaneously with the insider ...”
 
 Wilson v. Com-tech Telecommunications Corp., supra
 
 at 94.
 

 Thus, by virtue of the corporate insiders’ duties to the corporation, they, and by derivation their tippees, indirectly came under a duty to O’Connor to “abstain or disclose” if they possessed material nonpublic information. Under traditional tort principles, O’Connor has standing to sue for injuries resulting from the alleged breach of this duty to it. Indeed, in the circumstances of this case, it is nonsensical to speak of a duty to disclose owed to the corporation or its shareholders. The corporation presumably already “knows” the information which was allegedly misappropriated, and the shareholders would suffer no injury from lack of disclosure to them since it is alleged that the fraudulent practices occurred in connection with the purchase of options rather than shares. Moreover, O’Connor and other options traders who lacked information as to the impending takeover proposals are the only parties suffering direct injury from the alleged fraud.
 

 We are not persuaded by the argument that the grant of standing to options traders in these circumstances should be denied because it threatens the corporation and its insiders with new liability to a potentially large class of persons with whom they have no relationship. A moment’s thought makes it apparent that options traders are
 
 *1182
 
 the direct and foreseeable victims of fraudulent insider trading in options. Moreover, it was the defendants’ own choice to trade in options rather than stock, and if, as O’Connor alleges, the defendants’ options trading was fraudulent, there is no good reason to permit them to avoid compensating those directly injured by their conduct. Furthermore, O’Connor’s argument that denying options traders standing in the context of insider trading cases would create a broad loophole in the rules against insider trading is persuasive. The private cause of action for securities fraud was implied in order to provide a mode of compensation for those persons directly injured and to augment the enforcement mechanisms of the securities laws. Excepting options traders from the implied cause of action would work against those purposes.
 

 III.
 

 Smith, Becker, and DWRI move pursuant to Fed.R.Civ.Pr. 12(b)(6) to dismiss the claim under section 14(e) of the Williams Act and SEC Rule 14e-3 on the ground that the Williams Act is inapplicable in this case because no tender offer was actually made to the shareholders of Amax.
 

 Relying on the decision of the Court of Appeals in
 
 Lewis v. McGraw,
 
 619 F.2d 192 (2d Cir. 1980),
 
 cert. denied,
 
 449 U.S. 951,101 S.Ct. 354, 66 L.Ed.2d 214 (1981), defendants contend that there can be no violation of § 14(e) in the absence of a tender offer to the shareholders of the target corporation. Since the tender offer proposal here was conditioned on the approval of the Amax board and the board rejected the proposal at the time of the public announcement, defendants argue, the Amax shareholders were never confronted with an opportunity to tender their shares and therefore no claim under the Williams Act has been stated. According to this view, the sole purpose of the Williams Act, as set out by the Supreme Court in
 
 Piper v. Chris-Craft Industries, Inc.,
 
 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), is to ensure that target shareholders are provided with balanced and accurate information on which to make the decision whether to tender their shares or not: the Act was not intended to apply to an inchoate proposal for a tender offer. Moreover, to the extent that Rule 14e-3 may purport to apply here, it is argued that the rule exceeds the scope of the statute under which it was promulgated and is void.
 

 In addition, the defendants maintain that even if the Williams Act is deemed applicable in the circumstances, O’Connor would lack standing to sue because, as an options trader rather than a shareholder, O’Connor is not an intended beneficiary of the Act. Finally, it is argued that it is unnecessary to imply a private right of action under § 14(e) in these circumstances because a remedy already exists under § 10(b).
 

 O’Connor responds that section 14(e) prohibits “fraudulent, deceptive or manipulative acts or practices in connection with any tender offer,” and that trading on the basis of material, nonpublic information that a tender offer has been proposed is a fraudulent practice in connection with a tender offer, regardless of whether the offer actually became effective.
 

 O’Connor relies on Rule 14e-3, adopted by the SEC in September, 1980, which prohibits trading on the basis of material, nonpublic information whenever “a substantial step or steps to commence ... a tender offer” have been taken. O’Connor asserts that the presentation of the tender offer proposal to the Amax board constituted a substantial step toward the commencement of a tender offer and that the Rule is directed against the precise conduct alleged. O’Connor maintains that Rule 14e-3 is entitled to deference as an administrative interpretation compatible with the statutory language and the statutory purpose of protecting investors of the target company.
 

 In addition, O’Connor contends that it is an intended beneficiary of the Williams Act. It argues that the Act was framed to protect investors in situations where the prospect of a tender offer is reasonably likely to affect investment decisions and emphasizes that Rule 14e-3 specifically includes options within its coverage. More
 
 *1183
 
 over, O’Connor asserts that the prospect of a tender offer affected its investment decisions in the same manner as it would if O’Connor had been a target shareholder and that, in any event, it was obligated to become a shareholder if the options were in fact exercised.
 

 Finally, O’Connor contends that
 
 Lewis v. McGraw, supra,
 
 is distinguishable from this case because the lack of an actual tender offer there necessarily established the plaintiffs’ lack of reliance. No such bar exists here, O’Connor maintains, because it actually traded in the options of the target company without the benefit of the knowledge that a tender offer proposal had been made. Moreover, O’Connor notes that the court in
 
 McGraw
 
 specifically stated that statements made prior to the effective date of a tender offer may interfere with informed decisionmaking by investors and therefore may fall within the scope of the Williams Act. O’Connor emphasizes that the
 
 McGraw
 
 court cited with approval Judge Weinfeld’s decision in
 
 Applied Digital Systems, Inc. v. Milgo Electronic Corp.,
 
 425 F.Supp. 1145 (S.D.N.Y.1977), where injunctive relief was held available prior to a tender offer when it appeared likely that a tender offer would be made and that reliance was probable.
 

 Defendants reply that the
 
 Applied Digital
 
 doctrine is limited to situations where there is a clear intent to make a tender offer to the target shareholders. In the present case, it is argued, there was no such intent since the proposal was conditioned on the approval of the Amax board. Moreover, it is asserted that Rule 14e-3 is beyond the scope of the act as it was definitively construed in
 
 McGraw
 
 and that there is no indication in the statutory language or the legislative history that Congress intended § 14(e) to apply in open-market, as opposed to tender offer, situations.
 

 Our analysis begins with the proposition, not seriously contested by defendants, that Rule 14e-3, if valid, prohibits the conduct alleged in the complaint. Rule 14e-3 prohibits insider trading “if any person has taken a substantial step or steps to commence, or has commenced, a tender offer ...”
 
 [6]
 
 It is alleged in this case
 
 *1184
 
 that, during the relevant time period, Socal had proposed a takeover of Amax to the Amax board by means of a tender offer to the shareholders of Amax and conditioned ' on the approval of Amax’s board. Socal’s action constituted “a substantial step ... to commence ... a tender offer ...” The first issue presented is whether Rule 14e-3, as applied in this context, is void because it exceeds the scope of the statute under which it was promulgated. We conclude that it is not.
 

 Section 14(e) provides:
 

 “(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.”
 

 The critical phrase “in connection with any tender offer” bears both the interpretation presented by O’Connor and that presented by defendants. It can, as O’Con-nor contends, encompass cases where it is alleged that insiders tipped others about the impending public announcement of a tender offer proposal. The phrase may also, as defendants contend, refer to situations where shareholders are actually given the opportunity to tender their shares. Whichever is correct, however, it is at least clear that, by defining the scope of the statute in this indeterminate language, Congress intended the precise application of the statute to be worked out over time, in the light of practical experience as to takeover practices. Indeed, immediately after the quoted provisions of § 14(e), Congress provided that
 

 “The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.”
 

 In short, “Congress did not define the term ‘tender offer’ in the Williams Act. . . Rather . . . Congress ‘preferred to leave to the Commission and the courts the ability to deal effectively with transactions, not envisioned or imagined in 1968, which required the application of the statutory provisions of the Williams Act for the protection of investors.’ ”
 
 [7]
 
 Rule 14e-3, prohibiting cor
 
 *1185
 
 porate insiders from trading on the basis of nonpublic information that a tender offer had been proposed, appears on its face to be a reasonable administrative fulfillment of the SEC’s statutory duty to define the particular fraudulent acts which are banned by § 14(e).
 

 The argument that Rule 14e-3 exceeds the scope of the statute depends first on the proposition that the Williams Act was intended merely to regulate transactions between the tender offeror and the shareholder of the target company, not to regulate transactions on the open market in which the shareholder of the target company may engage. However, defendants do not cite any language in the statute, and we find none, which would so limit the reach of § 14(e). To the contrary, the statutory language quoted above is open-ended as to the transactions which might be covered and the broad grant of authority to the SEC to define the particular practices banned by the statute supports the proposition that the statute was not intended to be limited as defendants assert, so long as the agency regulations concern practices “in connection with a tender offer ...”
 

 Moreover, the distinction asserted by defendants between transactions between the tender offeror and the target shareholder and transactions between target shareholder and others on the open market would unduly restrict the broad protection to target shareholders intended by the Williams Act. As a practical matter, the decision facing an investor faced with a tender offer for his shares is not merely whether to tender his shares to the target company or not. The investor also has the choice whether to sell his shares on the open market. It is a fact of the securities market that the public announcement of a tender offer or a proposal for a tender offer has a significant effect on the open-market price of the securities of the target company. Rather than risk a tender which, for some reason (such as the failure of a sufficient number of other target shareholders to tender) may not result in a sale, the target shareholder may wish instead to sell on the ordinarily risking open market in order to gain the sure market “premium” immediately rather than run the risk that the offeror’s premium may not become effective. We have no doubt in those circumstances that fraudulent or misleading statements on the part of the offeror or the target company designed either to encourage or prevent such open market trading would constitute practices “in connection with a tender offer ...” and would fall under the rubric of § 14(e). By the same token, trading on the basis of nonpublic material information relating to the tender offer would constitute fraudulent practices “in connection with a tender offer” and would be encompassed by § 14(e) since in such circumstances the target shareholder would be denied the appropriate information on which to elect among the various choices facing him.
 

 It is true that here the allegedly fraudulent conduct occurred prior to the announcement of the tender offer proposal. However, this circumstance does not change the fact that the alleged failure to disclose the impending announcement of the tender offer proposal worked to deny the target invest the relevant information on which to decide whether to sell his shares in the same manner as fraudulent conduct operates when an offer has already been publicly announced. The very information the shareholder is denied in such circumstances is the information that the transaction, unbeknownst to him, is in connection with a tender offer attempt. The person trading on the basis of the information stands to gain precisely because of the impending announcement of the tender offer proposal, whether through a future tender or through an open-market sale. The loss suffered by the target shareholder-seller is the direct result of the lack of knowledge of the proposed tender offer. As the court in
 
 McGraw
 
 stated, unless pre-offer fraudulent conduct relating to the impending tender offer is deemed “in connection with a tender offer,” the risk of “defeating in substantial part the very purpose of the Act— informed decisionmaking by shareholders,”
 
 Lewis v. McGraw, supra
 
 at 195, would be run.
 

 
 *1186
 
 It is also true that in the present case the tender offer never became effective because it was conditioned upon the approval of the Amax board and the board rejected the proposal at the same time that it publicly announced it. However, this does not change the fact that the alleged wrong relates directly to a tender offer bid. As the alleged facts of this takeover bid confirm, the announcement of a proposed tender offer has significant market ramifications in the securities markets, regardless of whether the offer ultimately becomes effective or not. Informed decisionmaking by the security holder of a takeover target (whether shareholder or options trader) is defeated when others in the market trade on information which he lacks that a tender offer proposal has been made. Since the insiders’ sole purpose in effecting the trades alleged in the complaint would have been to capitalize on the pending tender offer proposal, the alleged fraud was “in connection with a tender offer” under § 14(e) regardless of whether the offer actually became effective. While we agree with defendants that the scope of the Williams Act provisions is not infinitely expandable to apply to any acts preceding a tender offer proposal, we conclude that the conduct alleged here, insider trading on the basis of nonpublic information that a tender offer proposal was being considered by the target board and would soon be publicly announced, are among the ills at which the Williams Act is directed and that the SEC accordingly had authority to prohibit such conduct under § 14(e).
 

 Moreover, the argument that Rule 14e-3 is void because § 14(e) had been definitively construed, prior to the rule’s enactment, to apply only where an actual tender offer is made is unpersuasive. While the Supreme Court in
 
 Piper v. Chris-Craft Industries, Inc.,
 
 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977) stated that “the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer,” that statement was made in the context of the Court’s consideration of the issue whether there existed “a private cause of action for damages by one of several contending offerors against a successful bidder or by a losing contender against the target corporation.”
 
 Id.
 
 The Court simply was not faced with the question of what constitutes an action “in connection with a tender offer.” Similarly, the Court of Appeals’ holding in
 
 McGraw
 
 that the shareholders there had no cause of action under § 14(e) because they had never had an actual opportunity to tender their shares is not determinative of the issue presented here. In
 
 McGraw,
 
 the target shareholders sued the corporation and its directors claiming that allegedly false statements were made by the board about the adequacy of the tender offer price when the board rejected the offer. Plaintiffs allege that, had the board provided complete and truthful information, the tender offer would have been consummated. The Court of Appeals confirmed the district court’s dismissal of the complaint, emphasizing that reliance was an element of a cause of action under § 14(e) and that in the
 
 McGraw
 
 context, “no reliance was possible under any imaginable set of facts ...”
 
 Lewis v. McGraw, supra
 
 at 195, since the tender offer was conditioned on the target board’s approval which was not given. Unlike the circumstances of
 
 McGraw,
 
 however, in the present case, O’Connor alleges specific conduct that it took, selling call options on Amax stock, that it would not have taken had it known of the tender offer bid. Indeed, in the context of nondisclosure cases, reliance is presumed if the withheld material was material.
 
 See Affiliated Ute Citizens of Utah v. United States,
 
 406 U.S. 128, 153, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).
 

 In addition, it is worth noting that
 
 McGraw
 
 was decided on April 3, 1980, several months before the promulgating of Rule 14e-3. Accordingly, its statements as to the scope of § 14(e) were based on the state of law as it then existed. While a serious question of the SEC’s authority would be presented if the Court of Appeals had already definitively construed the statute in a manner inconsistent with Rule 14e-3, we do not read the
 
 McGraw
 
 opinion to
 
 *1187
 
 constitute a broad interpretation of the general reach of § 14(e), but rather to consider the statute’s application in the circumstances of that case.
 

 The contention that O’Connor lacks standing because it traded in options rather than the shares of Amax is also unpersuasive. Rule 14e-3 specifically includes options trading within its scope of coverage. Furthermore, as discussed above, the Williams Act is not limited to trading between the tender offeror and the target shareholders, but includes open-market trading within its scope. Just as in the 10(b) context, corporate insiders in this context came under a duty to disclose the existence of the tender offer proposal or abstain from trading by virtue of their fiduciary duties to the corporation and its shareholders. The complaint alleges that O’Connor was injured by an alleged breach of this duty, and O’Con-nor thus has standing to recover.
 

 Finally, defendants’ argument that a right of action on behalf of options traders for injuries resulting from a breach of Rule 14e-3 and § 14(e) should not be implied because relief already exists under § 10(b) is without merit. The law of this Circuit is clear that a plaintiff may simultaneously pursue duplicative remedies under the securities laws.
 
 See, e.g., Fischman v. Raytheon Manufacturing Co.,
 
 188 F.2d 783 (2d Cir. 1951);
 
 Ross v. A. H. Robins Co.,
 
 607 F.2d 545, 554-55 (2d Cir. 1979),
 
 cert. denied,
 
 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).
 

 In sum, we conclude that Rule 14e-3 is within the scope of the statute under which it was promulgated and applies to the case at hand. Accordingly, O’Connor has stated a claim under § 14(e) of the Williams Act.
 

 IV.
 

 Amax moves pursuant to Fed.R.Civ.Pr. 12(b)(6) to dismiss the complaint on the ground that the complaint does not state a claim against the corporation. Amax emphasizes that there is no allegation that the
 
 corporation
 
 (as opposed to corporate insiders) engaged in insider trading or tipping, nor that the corporation made any false statements or was under a duty to disclose any information. Accordingly, Amax asserts, O’Connor has failed to state a claim against it under sections 10(b), 14(e), or for common law fraud.
 

 Amax contends that the allegations concerning the conduct of Amax “insiders” are insufficient to state a claim against Amax itself because a corporation is not vicariously liable under either the common law doctrine of
 
 respondeat superior
 
 or under the “controlling persons” provision of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), when its employees, officers or directors disclose material, non-public information in breach of their fiduciary duties to the corporation.
 

 O’Connor responds that Amax is vicariously liable for the alleged securities fraud of its employees, officers and directors under. traditional tort theories of
 
 respondeat superior
 
 and aiding and abetting, as well as under the “controlling persons” provisions of the 1934 Act. According to O’Connor, the Court of Appeals held in
 
 Marbury Management, Inc. v. Kohn,
 
 629 F.2d 705 (2d Cir. 1980), that a cause of action exists against a corporate defendant on a
 
 respondeat superior
 
 theory if there has been a violation of the securities laws by an officer, employee or other agent of the corporation. Since the complaint alleges violations of the securities laws on the part of Amax “insiders,” O’Connor contends, it states a claim against Amax itself. Relying on section 261 of the Restatement of Agency, Second (1958), O’Connor asserts that the insiders who committed the alleged fraud acted as agents for Amax because Amax put them in a position to commit fraud upon third persons while apparently acting within their authority. O’Connor asserts that the complaint sufficiently alleges that the .insiders were acting within the scope of their employment and acted with the authority of their corporate positions.
 

 O’Connor next maintains that the complaint states a claim against Amax on an aiding and abetting theory. O’Connor asserts that knowledge of the violation can be
 
 *1188
 
 imputed to the corporation or that the corporation may have been reckless in not learning of the fraud, and that the requirement that the aider and abettor render substantial assistance to the primary wrongdoer is satisfied by Amax’s inaction which intentionally furthered the fraud or prevented its discovery. O’Connor concedes that, due to its lack of knowledge of the manner in which the alleged tipping took place, it is unable to delineate the precise manner of Amax’s involvement or inaction with respect to the alleged fraudulent conduct.
 

 O’Connor also argues that Amax is liable under the “controlling persons” provision of § 20(a) insofar as the corporation controls the acts of its employees and O’Connor argues that Amax could be found to have culpably participated in the tipping or insider trading if the corporation had failed to educate its insiders about their responsibilities under the securities laws.
 

 Amax replies that the complaint nowhere alleges, even in conclusory terms, any facts to support the various theories of vicarious liability asserted by O’Connor. In addition, Amax argues that since options are not securities issued by Amax, an insider who traded on the basis of material, nonpublic information breached his fiduciary duties only to Amax and its shareholders, not to options traders.
 

 Amax’s motion to dismiss the complaint is granted. The complaint alleges no conduct whatsoever on the part of Amax which could form the basis for primary or secondary liability with respect to the fraudulent transactions alleged in the complaint. First, the common-law doctrine of
 
 respondeat superior
 
 is inapplicable in this context because a corporate insider necessarily exceeds the scope of his employment when he trades on the basis of material, nonpublic information. While it is true that the Court of Appeals held in
 
 Marbury Management, Inc. v. Kohn, supra,
 
 that § 20(a) was not the exclusive test for secondary liability for securities fraud, and that common-law principles of
 
 respondeat superior
 
 supported the imposition of liability on an employer for his employee’s securities law violations when acting within the scope of employment, O’Connor has failed to articulate how the alleged trading by Amax insiders could be said to be within the scope of their employment or even whether the insiders were necessarily employed by Amax. In
 
 Marbury Management
 
 the Court noted that the employee there had acted as an employee of the companies in the relevant transactions, that there was evidence that he had profited from the transactions beyond his compensation from his employer, and that the alleged fraudulent conduct occurred while and in the course of the employee’s rendering services to his employer. Indeed, in the garden variety § 10(b) suit against a broker, the acts of the representative are ordinarily within the scope of his employment to the extent that they are taken to encourage a particular transaction and thereby to further the interests of the employer. By contrast, insider trading and tipping cannot ordinarily said to be within the course of the employment. An employee who trades on the basis of material inside information or who tips cannot be said to act as an employee in the transaction. Furthermore, his actions are ordinarily motivated by the desire for personal profit and are not in the interests of the corporation. In short, unlike the brokerage context considered in
 
 Marbury Management,
 
 an employee who trades on the basis of insider information or who tips such information must normally be viewed as on a frolic of his own. Since such actions cannot be regarded as occurring within the scope of the employment, the employer cannot be held liable under common-law principles of
 
 respondeat superior.
 

 Second, the complaint does not allege sufficient facts to support an aiding and abetting or “controlling person” theory of liability against Amax. Aiding and abetting liability with respect to securities fraud requires: 1) the commission of a securities law violation by a primary party, 2) knowledge of the violation or a reckless disregard of the facts by the alleged aider or abettor and 3) substantial assistance by the aider
 
 *1189
 
 and abettor in the violation.
 
 Rolf v. Blyth, Eastman Dillon & Co., 570
 
 F.2d 38, 47 — 48 (2d Cir.),
 
 cert. denied,
 
 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Similarly, the Court of Appeals has held that liability under the “controlling persons” provision of section 20(a) requires that the controlling persons be “culpable participants in the fraud perpetrated by controlled persons.”
 
 Lanza v. Drexel & Co.,
 
 479 F.2d 1277, 1299 (2d Cir. 1973).
 

 While the complaint alleges the commission of a securities law violation by a primary party, the Amax insiders, it alleges no facts as to knowledge or reckless disregard of the facts by Amax, nor does it contain even conclusory allegations that Amax lent substantial assistance to the alleged fraud. Moreover, while the timing, volume and pattern of trades may suffice at this stage of the litigation to support the allegations against primary parties, the same is not true with respect to Amax, which is alleged to be secondarily liable. There is simply no reason to assume that, because Amax insiders may have tipped or traded on the basis of material, nonpublic information, Amax itself aided their conduct or had actual knowledge or been reckless in not actually knowing of the conduct. Accordingly, the complaint against Amax is dismissed without prejudice.
 

 VI.
 

 DWRI and Smith move pursuant to Fed. R.Civ.Pr. 9(b) to dismiss the complaint on the ground that the alleged fraud is not pled with particularity.
 

 Defendants contend that the complaint is insufficient in failing to allege as to each defendant 1) facts from which it can be inferred that the defendant knowingly traded on the basis of material, nonpublic information, 2) the nature and the timing of the alleged tipping, 3) who tipped each defendant, 4) whether each defendant is named as a primary wrongdoer or an aider and abettor, and, if as an aider and abettor, how each defendant knew that his customer had been tipped or how each defendant’s conduct furthered the alleged fraud, and 5) facts from which it can be inferred that tippee defendants knew the information was confidential and was derived from a corporate source. It is also argued that the complaint is defective in not alleging on information and belief facts about which O’Connor has no actual knowledge, and in failing to provide substantiation for those allegations which should have been made on information and belief. Moreover, it is contended that there are no facts to support the allegations of fraud. Defendants note that the original complaint merely alleged that “unknown insiders tipped unknown customers” and that when Becker and DWRI provided O’Connor the names of their customers and employees who purchased call options immediately prior to the public announcement, O’Connor simply substituted their names without conducting any investigation.
 

 O’Connor responds that the fraud of trading on inside information is sufficiently described in the complaint and that the purposes underlying Rule 9(b) have been satisfied because the defendants have been informed of the charges against them. O’Connor contends that it is not required under the rule to plead detailed evidentiary matters, but rather to identify with particularity the alleged fraudulent acts or omissions on which its claims rest. Moreover, O’Connor maintains that the allegations of the complaint are substantiated by the volume and sequence of “out of the money” call options solicited by Dean Witter registered representatives for their own and their customers’ accounts in the two week period and specifically the three day period immediately preceding the announcement of the takeover bid. O’Connor asserts that the fact that the selling price of Amax stock would have had to jump more than 32% in eighteen days for a purchaser of the call options to realize a profit and avoid losing his entire investment supports the inference of knowledge of material, nonpublic information on the part of defendants.
 

 O’Connor asserts that the complaint specifically alleges the content of the material
 
 *1190
 
 omission (the imminent announcement of the Socal proposal), 2) the timing of the omission (two weeks prior to the public announcement), 3) the nature of the representatives’ wrongdoing (either having actual knowledge that the trades they executed were fraudulent or acting in reckless disregard of the possibility), 4) the facts underlying the representatives’ knowledge: i.e., that the transactions were economically irrational unless one knew of the impending announcement, and 5) whether each representative is named as an individual or a primary wrongdoer (in cases where the customer initiated the transaction, the representatives are alleged to have aided and abetted; in cases where the representative initiated, they are charged as primary wrongdoers). The only remaining matter which defendants claim lacks specificity is the question which insiders tipped which customers or representatives, an issue which O’Connor asserts must be developed through discovery since, by the nature of the wrong alleged, it has yet had no way of determining this fact. Finally, O’Connor asserts that it would frustrate the policies underlying the antifraud provisions of the federal securities law to dismiss the complaint under Rule 9(b) where the precise information lacking is peculiarly within the knowledge of the defendants.
 

 Defendants reply that O’Connor has failed to plead the essential facts from which it can be inferred that the alleged primary wrongdoers had knowledge of the impending announcement and from which it can be inferred that the alleged aiders and abettors knew that their customers were trading on the basis of nonpublic information. They dispute O’Connor’s assertion that knowledge can be inferred from the volume and timing of the purchases, asserting that the fact that the purchases only represented a small portion of most of the customers and representatives’ net worth negatives the inference of knowledge. It is also contended that the purchases would not be irrational in the absence of knowledge, since the option could be sold if the market price rose a few points and thus the risk undertaken by defendant purchasers was only that the price would rise in some amount, not that it would increase 32% in eighteen days, as O’Connor asserts. Moreover, since the purchases were not substantial in relation to each customer’s net worth, it is asserted that there are no facts to support an inference of knowledge on the part of the representatives. Finally, defendants contend that the complaint nowhere alleges conduct on the part of each individual defendant and that, if the facts contained in O’Connor’s motion papers provide sufficient grounds to support the allegations of the complaint, the complaint still must be dismissed because those facts have not been plead.
 

 Fed.R.Civ.Pr. 9(b) requires:
 

 “In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.”
 

 O’Connor persuasively argues that its inability to allege some facts with particularity, such as the identity of the source of the alleged corporate leak, is a direct result of the covert nature of the alleged insider trading, and that therefore the complaint should not be dismissed because of its failure to plead such facts with particularity. Moreover, it is true that the complaint suffices to give the defendants general notice that they are charged with either knowingly trading on the basis of material, nonpublic information concerning Socal’s tender offer proposal to Amax, or tipping such information, or knowingly or recklessly rendering assistance for such fraudulent practices. We agree with O’Connor that the pattern, timing, sequence, and asserted irrationality of the purchases of “out of the money” Amax options sufficiently substantiates, at least for pleading purposes, the allegations of the complaint.
 

 Nevertheless, the complaint does not entirely satisfy the requirements of Rule 9(b). The complaint lists customers and registered representatives of Becker and DWRI in its description of parties but,
 
 *1191
 
 in the remainder of the complaint, they are not mentioned by name. Instead, the complaint refers in blanket terms to “insiders,” “customers” and “registered representatives” in its actual allegations of wrongdoing. Moreover, with respect to Smith and the other alleged tippees, the complaint does not even state in conclusory terms that they knew of the confidential nature of the inside information or of its corporate source.
 

 A party charged with fraud is entitled to notice of the particular allegations on which the claim is based and is entitled to notice of the particular wrongs which he or she as an individual, as opposed to a member of a broad group of “insiders,” “customers” or “representatives”, is charged.
 
 Ross v. A. H. Robins,
 
 607 F.2d 545, 557 (2d Cir. 1979),
 
 cert. denied,
 
 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980);
 
 Goldberg v. Meridor,
 
 81 F.R.D. 105 (S.D.N. Y.1979). The complaint must include: 1) the nature of each individual defendant’s participation in the fraud, including facts constituting scienter, 2) whether the individual defendant is charged with tipping or trading or both, 3) whether the defendant is being sued as a primary defendant or under a theory of vicarious liability, and 4) as to allegations which must be made on information and belief due to O’Connor’s lack of actual knowledge, a statement of the facts upon which the belief is based,
 
 Ross v. A. H. Robins, supra; Schlick v. Penn-Dixie Cement Corp.,
 
 507 F.2d 374 (2d Cir. 1974),
 
 cert. denied,
 
 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). While, as noted above, we agree with O’Connor that the timing, volume, sequence, and arguable irrationality of the alleged purchases of Amax options would serve to substantiate an allegation of scienter with respect to the customers, the brokers and their representatives, those facts have not been pled in the complaint. Under Rule 9(b), defendants are entitled to this specificity in the pleadings.
 

 The motion of DWRI and Smith to dismiss the complaint for failure to plead fraud with particularity under Rule 9(b) is granted unless within twenty days O’Con-nor serves and files an amended complaint in conformance with this opinion. Since O’Connor’s responsive papers on the motion demonstrate that it will' be able to amend its complaint to satisfy these requirements, the stay of discovery which was granted pending the disposition of this motion is hereby vacated. Amax’s motion to dismiss the complaint is granted without prejudice. The remaining motions are denied.
 

 It is so ordered.
 

 [1]
 

 . O’Connor filed this action as a class action on behalf of “all persons, including Plaintiff, who sold call options in the stock of AMAX (‘AMAX Call Options’) on the ASE between February 23, 1981 and March 6, 1981." (First Amended Complaint, ¶ 14). A motion for certification of the class is under consideration.
 

 [2]
 

 . DWRI moves on behalf of Ann Marie Bero, Stephen Bradley, Dean Callander, Fred Collins, John Damsen, Robert Gilbert, John Hanson, Larry Hayden, Mike Kemp, David Kupat, Ralph Raulli, and Bruce Seligman.
 

 [3]
 

 . Becker moves on behalf of John Pierce and Robert Rafford.
 

 [4]
 

 . Section 10(b) provides in full:
 

 . “It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 

 ******
 

 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.”
 

 [5]
 

 . Rule 10b-5 provides in full:
 

 “It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 

 (a) To employ any device, scheme, or artifice to defraud.
 

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.”
 

 [6]
 

 . Rule 14e-3 provides in full:
 

 “(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the ‘offering person’), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:
 

 (1) The offering person,
 

 (2) The issuer of the securities sought or to be sought by such tender offer, or
 

 (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.
 

 (b) A person other than a natural person shall not violate paragraph (a) of this section if such person shows that:
 

 (1) The individual(s) making the investment decision on behalf of such person to purchase or sell any security described in paragraph (a) of this section or to cause any such security to be purchased or sold by or on behalf of others did not know the material, nonpublic information; and
 

 (2) Such person had implemented one or a combination of policies and procedures, reasonable under the circumstances, taking into consideration the nature of the person’s business, to ensure that individual(s) making investment decision(s) would not violate paragraph (a) of this section, which policies and procedures may include, but are not limited to, (i) those which restrict any purchase, sale and causing any purchase and sale of any such security or (ii) those which prevent such individual(s) from knowing such information.
 

 (c) Notwithstanding anything in paragraph (a) of this section to contrary, the following transactions shall not be violations of paragraph (a) of this section:
 

 (1) Purchase(s) of any security described in paragraph (a) of this section by a broker or by another agent on behalf of an offering person; or
 

 (2) Sale(s) by any person of any security described in paragraph (a) of this section to the offering person.
 

 
 *1184
 
 (d)(1) As a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e) of the Act, it shall be unlawful for any person described in paragraph (d)(2) of this section to communicate material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section
 
 except
 
 that this paragraph shall not apply to a communication made in good faith,
 

 (i) To the officers, directors, partners or employees of the offering person, to its advisors or to other persons, involved in the planning, financing, preparation or execution of such tender offer;
 

 (ii) To the issuer whose securities are sought or to be sought by such tender offer, to its officers, directors, partners, employees or advisors or to other persons, involved in the planning, financing, preparation or execution of the activities of the issuer with respect to such tender offer; or
 

 (iii) To any person pursuant to a requirement of any statute or rule or regulation promulgated thereunder.
 

 (2) The persons referred to in paragraph (d)(1) of this section are:
 

 (i) The offering person or its officers, directors, partners, employees or advisors;
 

 (ii) The issuer of the securities sought or to be sought by such tender offer or its officers, directors, partners, employees or advisors;
 

 (iii) Anyone acting on behalf of the persons in paragraph (d)(2)(i) of this section or the issuer or persons in paragraph (d)(2)(h) of this section; and
 

 (iv) Any person in possession of material information relating to a tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from any of the above.”
 

 [7]
 

 . Letter from SEC Chairman Harold M. Williams to Senator William Proxmire, February 15, 1980, quoting Letter from Senator William Proxmire and colleagues to SEC Chairman Harold M. Williams, (1979-1980 Transfer Binder) Fed.Sec.L.Rep. (CCH), ¶ 82,453.