680 F.2d 1286
 Fed. Sec. L. Rep. P 98,761
A. B. POLINSKY, an individual, and Scotsman Distributors,
Inc., a California corporation, Plaintiffs-Appellees,
v.
MCA INC., a Delaware corporation, MCA Enterprises,
Incorporated, a California corporation and Bear,
Stearns & Co., a limited partnership,
Defendants-Appellants.
 No. 81-5115.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 3, 1982.
Decided July 8, 1982.
 
 Thomas Larry Watts, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for defendants-appellants.
 Eugene L. Freeland, Gray, Cary, Ames & Frye, San Diego, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before WRIGHT, SNEED and ALARCON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 MCA Inc., MCA Enterprises Inc., and Bear, Sterns & Co. (Appellants) appeal from the district court's order denying their motion for summary judgment against Polinsky and Scotsman Distributors, Inc. (Appellees).
 
 
 2
 On appeal Appellees allege that Appellants' market manipulation of Coca Cola Bottling Co. of Los Angeles (CCLA) stock violated securities law Rule 10b-5 and section 14(e) of the Williams Act. Specifically, Appellees assert that: (1) Appellants had a duty under Rule 10b-5 to disclose their manipulative tender offer scheme; (2) Appellants' market manipulations violated Rule 10b-5; and (3) Appellants' market manipulations violated section 14(e) of the Williams Act.
 
 
 3
 On motions for summary judgment we engage in de novo review. State ex rel. Edwards v. Heimann, 633 F.2d 886, 888 n.1 (9th Cir. 1980). In reviewing a denial of a motion for summary judgment: (1) we view the evidence in the light most favorable to the party against whom the summary judgment is brought; and (2) we determine whether the district court correctly found no genuine issue of material fact and that the moving party was not entitled to judgment as a matter of law. Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295, 1300 (9th Cir. 1981). In the instant case we find that there were no genuine issues of material fact and that Appellants are entitled to summary judgment as a matter of law.
 
 
 4
 On August 9, 1977, MCA Inc., through its wholly-owned subsidiary MCA Enterprises Inc., began to purchase on the open market common stock of CCLA through its stockbroker, Sloate, Weisman, Murray & Co., Inc. (Sloate). Sloate opened a numbered account for MCA with Appellant Bear, Sterns (Bear). Bear was not aware that MCA was Sloate's customer.
 
 
 5
 Sloate informed Bear that its unnamed client (MCA) was interested in purchasing 3,000 shares of CCLA common stock. Bear did not have enough CCLA shares to meet this request, thus, it purchased some of the requested shares from Goldman, Sachs and Co. (Goldman). Subsequently, Goldman on its own initiative offered to sell Bear a number of CCLA convertible preferred shares. Bear purchased these shares from Goldman and resold them to MCA through Sloate. Thereafter, Goldman again on its own initiative, informed Bear that more shares of CCLA convertible preferred stock were available for sale. These shares were also purchased by Bear and resold to MCA. Goldman had purchased these CCLA convertible preferred stocks from Appellees. Neither MCA nor Sloate dealt directly with either Goldman or Appellees.
 
 
 6
 On October 7, 1977, MCA publicly announced the CCLA stock tender offer. A few days later on October 11, MCA publicly announced the terms of the tender offer and that it would pay $30.00 per share for CCLA common stock and $58.50 for CCLA convertible preferred stock. MCA's tender offer prices presented, respectively, a 30 percent and 34 percent premium above then prevailing market prices for these stocks.
 
 
 7
 On October 19, 1977, Northwest Industries, Inc. (Northwest) made public a competing tender offer for CCLA common and convertible preferred stock at prices of $40.00 and $78.00 respectively. According to MCA, it was unaware prior to October 19, 1977 that Northwest would be making this tender offer. MCA did not attempt to outbid the Northwest tender offer for CCLA stock and on November 3, 1977, MCA tendered all its previously acquired CCLA stock to Northwest.
 
 
 8
 Appellees filed a complaint on December 13, 1977, alleging that MCA actions had violated Rule 10b-5 and section 14(e) of the Williams Act. MCA moved for summary judgment.
 
 I.
 
 9
 The threshold issue in this case is whether Appellees have standing to bring each of their claims. "A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ....' " Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting Linda R. S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). See Data Processing Service v. Camp, 397 U.S. 150, 151-54, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). Moreover, this circuit in Raschio v. Sinclair, 486 F.2d 1029, 1030 (9th Cir. 1973), held that in order to have standing to sue under 10b-5 the plaintiff must establish a sale or purchase of stock in connection with the alleged violative conduct.
 
 II.
 
 10
 The gravamen of Appellees' complaint is that Appellants had a duty to disclose their intent to make a later tender offer at the time they purchased Appellees' CCLA stock. If Appellants' failure to disclose is viewed as part of a manipulative scheme to defraud Appellees, then behavior violative of 10b-5(a) and (c)[1] is at issue.
 
 
 11
 Appellees have standing to assert this claim since the alleged harm-loss of profits from the sale of their stocks-is a direct result of Appellants' failure to disclose their intent to make a later tender offer. Furthermore, if Appellants' nondisclosure is seen as part of the manipulative scheme to defraud Appellees, then their sale of CCLA stock to Appellants satisfies the standing requirement enunciated in Raschio.
 
 
 12
 However, even if Appellees have standing to assert Appellants' fraudulent nondisclosure, their claim has no merit. While "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b), this liability must be based on a duty to disclose between the parties." Chiarella v. United States, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980). In Chiarella the Supreme Court rejected the notion that Rule 10b-5 liability results from the mere failure to disclose nonpublic market information in market transactions between strangers. Id. at 235, 100 S.Ct. at 1118. "The contrary result is without support in the legislative history of 10(b) and would be inconsistent with the careful plan that Congress has enacted for regulation of the securities markets." Id. The parties to the instant case were market strangers-all stock transactions between them were handled by brokers and neither party knew the identity of the actual buyer or seller of the stock.
 
 
 13
 In addition, the Chiarella court cited with approval General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 164 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969) for the proposition that a tender offeror's preannouncement silence does not violate 10b-5 because there is no relationship between the offeror and seller. Chiarella, 445 U.S. at 232 n.14, 100 S.Ct. at 1116 n.14. Moreover, before a purchase of five percent or more of a target company's stock, the securities law[2] imposes no duty on a potential tender offeror to disclose its plan, bidding strategy, or hopes for a higher "white knight offer."[3] Thus, a purchaser of stock who has no fiduciary relationship to the prospective seller of the stock and who owns less than five percent of the target companies' stock has no duty to disclose circumstances that will insure the purchaser pays the highest possible price for the stock.
 
 III.
 
 14
 Next, Appellees claim that Appellants violated Rule 10b-5(a) and (c) when they made the pre-tender offer purchases of CCLA stock with the intent to subsequently manipulate the market by making a "low ball tender offer."[4] Appellees allege that Appellants acted with full knowledge that this pre-tender offer would induce a "white knight offer" and allow Appellants to collect handsome profits on its stock purchases. Thus, according to Appellees, the open market purchase of CCLA stock comprised the first step in their alleged manipulative profit making scheme, thereby, connecting Appellees' sale of stock with Appellants' later manipulative tender offer.
 
 
 15
 Even assuming arguendo that Appellants' "low ball tender offer" was a manipulative scheme violative of Rule 10b-5(a) and (c), Appellees were not harmed by the manipulation and, thus, have no standing to bring this action. Appellees' injury arose from the pre-tender offer open market purchases and Appellants' nondisclosure of their intent to make a later tender offer. Appellees' injury was not a result of any later market manipulation by Appellants. If Appellants' tender offer had been successful (no "low ball tender offer" had occurred), then Appellees' position would not have changed and they would not have made the additional profits they seek. On the other hand, if Appellees had not sold their stock to Appellants, Appellees would have received the profits they seek when Appellants engaged in their tender offer manipulation to induce a "white knight offer." In sum, whether or not Appellants engaged in a manipulative scheme within the meaning of Rule 10b-5(a) and (c) has no relationship to the harm alleged by Appellees.[5]
 
 IV.
 
 16
 Finally, Appellees allege that Appellants' manipulative tender offer scheme was violative of the Williams Act § 14(e). This section prohibits misleading statements or omissions of material facts or any fraudulent, deceptive or manipulative acts or practices in connection with any tender offer. Neither the Williams Act nor the Securities and Exchange Commission (SEC) have defined the term "tender offer." However, the SEC has suggested certain characteristics as being indicative of a tender offer. The district court in Wellman v. Dickinson, 475 F.Supp. 783, (S.D.N.Y.1979) adopted these SEC characteristics "as qualities that set a tender offer apart from open market purchases, privately negotiated transactions or other kinds of public solicitations." Id. at 824. These characteristics of a tender offer are as follows:
 
 
 17
 (1) active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only a limited period of time; (7) offeree subjected to pressure to sell his stock. Id. at 823-24.
 
 
 18
 See also, H.Rep.No.1711, 90th Cong., 2d Sess. 2, reprinted in 1968 U.S.Code Cong. & Ad.News 2811 (defines tender offer).
 
 
 19
 Appellees contend that the pre-tender offer purchase of stock by Appellants was part and parcel of their subsequent tender offer and therefore, was within the ambit of § 14(e). While Appellees have standing to raise this issue we are not persuaded by Appellees' argument that the pre-tender offer purchase of stock was related to the later tender offer. These pre-tender offer stock purchases had none of the indicia associated with tender offers. Appellants made no public announcements of their desire to purchase CCLA stock, made no special bids and did not solicit any CCLA shareholder. Appellants paid a fair market price rather than a premium price for Appellees' stock and the offer to buy the CCLA stock was not contingent on the tender of a certain number of shares. Moreover, not only was there no pressure exerted on Appellees to sell their stock to Appellants, it was the Appellees themselves who voluntarily offered via their broker to sell their CCLA shares to Appellants. Appellants' pre-tender offer purchase of Appellees' stock was not a part of the tender offer and, thus, the purchase was not violative of § 14(e) of the Williams Act.
 
 
 20
 In conclusion, we hold that there were no genuine issues of material fact and that Appellants are entitled to summary judgment as a matter of law.
 
 
 21
 The order of the district court denying summary judgment to Appellants is REVERSED.
 
 
 
 [1]
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, prohibits the use of "any manipulative or deceptive device" in connection with the purchase or sale of any security. To implement this section the Securities and Exchange Commission promulgated Rule 10b-5:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 CFR § 240.10b-5.
 
 
 [2]
 Section 13(d) of the Williams Act requires that a person who acquires five percent of the outstanding shares of any class of registered securities, to file certain information with the Securities and Exchange Commission within ten days after the acquisition. Section 14(d) prohibits the making of a tender offer if after its consummation the offeror would own more than five percent of the stock, unless the information required by § 13(d) is filed with the Securities and Exchange Commission
 
 
 [3]
 A "low ball tender offer" is a bid made by the offeror at such a low price that it enables him to gain control of the target company's stock at a "bargain price."
 
 
 [4]
 A "white knight" is a "friendly" corporation located by the target company to make a tender offer at a higher price than the original "unfriendly" tender offeror's bid. This is done to protect the target company by encouraging the stockholders to sell their shares of stock to the "white knight" instead of the "unfriendly" tender offeror
 
 
 [5]
 Appellees allege the MCA previously engaged in a similar type of stock market manipulation in their purchase and sale of Sea World stock and, thus, a present manipulative intent can be inferred from this past conduct. During oral argument, Appellants asserted that the Sea World transactions were not considered by the district court when it denied Appellants' summary judgment motion. Appellees contended that these transactions were regarded by the court
 On March 18, 1982, an order was filed by this court to remand this case to the district court, "for the limited purpose of making an express written finding as to whether it (district court) considered the Sea World transactions in denying Appellants' motion for summary judgment." On April 1, the district court published its findings and stated that it had considered the Sea World transactions when it denied Appellants' motion for summary judgment.
 In light of the fact that Appellees were not harmed by Appellants' alleged CCLA manipulative market scheme, any previous market manipulations are irrelevant. Even assuming that the Sea World and the CCLA stock transactions were manipulative, Appellees had no standing to bring this action because they failed to establish the requisite harm.