Michael E. MOSS, Plaintiff,

v.

MORGAN STANLEY INC., E. Jacques Courtois, Jr., Adrian Antoniu, and James M. Newman, Defendants.

No. 82 Civ. 5182(MP).

United States District Court, S.D. New York.

Jan. 10, 1983.

Kaplan, Kilsheimer & Foley by Robert N. Kaplan, Richard J. Kilsheimer, New York City, Kohn, Milstein, Cohen & Hausfeld by Herbert E. Milstein, Steven J. Toll, Washington, D.C., for plaintiff.

¡Davis Polk & Wardwell by Henry L. King, Arthur F. Golden, New York City, for defendant Morgan Stanley Inc.

Gordon Hurwitz Butowsky Baker Weitzen & Shalov by Franklin B. Velie, Mathew Hoffman, Robert J. Schechter, New York City, for defendant James M. Newman.

OPINION

MILTON POLLACK, District Judge.

Plaintiff Moss, who seeks to represent the class of all those who sold shares of Deseret Pharmaceutical Company stock on November 30, 1976, brings this suit for damages against Newman, Courtois and Antoniu and Morgan Stanley in the wake of Newman's conviction for securities fraud and mail fraud in connection with a tender offer made for Deseret stock. Moss asserts claims against Newman, Courtois and Antoniu based on Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 and the Rules promulgated thereunder, Rule 10b–5 and Rule 14e–3. In addition, Moss claims that Morgan Stanley is derivatively liable for these Securities Act violations. Moss also asserts pendent state law claims of fraud and claims that Morgan Stanley is liable under the doctrine of respondeat superior. Finally, Moss asserts that all of the defendants, including Morgan Stanley have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq., and that they are therefore liable for treble damages.

Defendant Newman has moved to dismiss the complaint for failure to state a claim on which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Morgan Stanley has moved to dismiss the complaint under Rule 12(b)(6) and for summary judgment under Rule

56(b) and for attorneys' fees and costs pursuant to Rule 11. For the reasons appearing hereafter, the motions to dismiss the amended complaint will be granted.

*Summary of Events.*

In December 1976, Warner Lambert Company made a cash tender offer for Deseret Pharmaceuticals Company. On or about November 23, 1976, Warner engaged the services of Morgan Stanley, in its capacity as an investment banker, to advise and assist Warner in its effort to acquire control of Deseret. Morgan Stanley was to investigate Deseret, evaluate its stock and recommend a price for Warner to offer Deseret shareholders in a tender offer. The defendant, E. Jacques Courtois, Jr., was employed by Morgan Stanley in its Merger and Acquisition Department. In that capacity, Courtois obtained knowledge of Warner's plan.

On or about November 30, 1976, Courtois disclosed to defendant Adrian Antoniu the information pertaining to Warner's plan to acquire Deseret stock. Antoniu was at the time an employee of Kuhn Loeb & Co., another broker-dealer and investment banker. Antoniu then disclosed the non-public information about the planned Warner offering to defendant James M. Newman, a stockbroker. The latter advised certain of his customers to buy Deseret stock in anticipation of Warner's tender offer, and purchased Deseret stock for his own account and others at prices substantially below the price which Warner offered to Deseret stockholders shortly thereafter.

As a result of these activities, Newman was tried and convicted on 15 counts of fraud. Antoniu pleaded guilty. Courtois was indicted but has not yet been tried as he is presently believed to be living in South America.

*Section 10(b) Claim.*

■ A plaintiff claiming damages under Section 10(b) must establish the existence of a special relationship by the defendant with an insider or the plaintiff. Absent this, nondisclosure of nonpublic market information is not actionable. "The essential purpose of Rule 10b–5 ... is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 235 (2d Cir.1974), quoting *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir.1974). Thus, as stated in *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275, 282 (2d Cir.1975), "the party charged with failing to disclose market information must be under a duty to disclose it to the plaintiff."

■ In this case, none of the defendants owed plaintiff a duty of disclosure or abstention. None of the defendants had any tie to the issuer, Deseret, in whose stock they traded. As Morgan Stanley was not employed by Deseret but by Warner, neither Morgan Stanley nor its employees were insiders of Deseret. Thus, Newman, even if he is viewed as standing in the shoes of the Morgan Stanley employee, Courtois, when he traded, purchased stock on the basis of information that was obtained from a source outside of the issuer. While the information that led to the purchase was nonpublic, it was outside not inside information.

The argument that defendants did not owe the requisite duty to the plaintiff is based on *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed. 348 (1980), where the Supreme Court held that an individual who was not an insider of the issuer in whose stock he traded could not be found to have violated Section 10(b) based on a theory of the breach of a duty to the shareholders of the issuer. In *Chiarella, supra,* the Court reversed the conviction under Section 10(b) of a printer who had traded in stock on the basis of non-public information that he had obtained in the course of his employment. Like the defendants in the present action, Chiarella was an outsider of the corporations in whose stock he traded. The Court stated:

> [T]he element required to make silence fraudulent—a duty to disclose—is absent in this case. No duty could arise from petitioner's relationship with the sellers

of the target company's securities, for petitioner had no prior dealings with them. He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their confidence.

*Id.* at 232, 100 S.Ct. at 1117.

This Supreme Court argument compels a finding that Newman, Courtois and Antoniu cannot be liable to plaintiff for a violation of Section 10(b). As outsiders of Deseret, they did not owe the Deseret shareholders any duty of disclosure before trading. As the Ninth Circuit has recently noted:

> A purchaser of stock who has no fiduciary relation to the prospective seller of the stock and who owns less than 5% ... has no duty to disclose circumstances that will insure that the purchaser pays the highest possible price.

*Polinsky v. MCA, Inc.,* 680 F.2d 1286, 1290 (9th Cir.1982). As no duty to disclose or abstain was owed to the Deseret stockholders, they have no standing to sue for damages under Section 10(b) as the essential element of a breach of a duty owed to them is absent.

■ Recognizing that in order to set out a claim for damages under Section 10(b) one must show that the defendants have breached a duty owed to the plaintiff, Moss attempts to find a source that could create a duty owed to him by defendants. One of these efforts to create a duty to the stockholders of Deseret focuses on the duty that Courtois owed to Morgan Stanley. Plaintiff argues that Courtois owed a fiduciary duty to Morgan Stanley and to Morgan Stanley's client Warner. He claims that this duty to Morgan Stanley and its client Warner gave rise to a separate duty to disclose or abstain that was owed to the shareholders of Deseret. This argument fails.

■ It is true that a criminal violation of Section 10(b) can be based upon the breach of a duty owed to a party other than the party to the transaction. While the Supreme Court has not yet specifically addressed the question, the Second Circuit has

held that a *criminal* violation of Section 10(b) can be based on the breach of a duty owed to the acquiring corporation or other party even though no duty is owed to the issuer. *United States v. Newman,* 664 F.2d 12 (2d Cir.1981). In *Newman, supra,* the Court reversed the dismissal of the Section 10(b) count against the defendant Newman of this present action. It held that Courtois did owe a duty to Morgan Stanley and its client Warner and that Newman, as Courtois' tippee, was subject to this same duty. Thus, as there was a breach of a duty, Section 10(b) liability was possible. It is essential to note, however, that this case did not find any duty owed to the issuer, Deseret, or to its stockholders. As *Newman, supra,* was a criminal prosecution, this question of the privity of the stockholders of Deseret was not before the Court, and it was not addressed.

Thus, even though there may have been a fiduciary duty to Morgan Stanley and Warner in this case, there is no support for the argument that this duty transformed itself into a duty owed to the stockholders of Deseret, as is necessary for a finding that Moss has a claim for damages under Section 10(b). A holding that the duty owed to Morgan Stanley and Warner gives rise to a duty to the stockholders of Deseret would be wholly inconsistent with the teaching of the Supreme Court in *Chiarella, supra,* that a duty to disclose under Section 10(b) arises out of a relationship of trust and confidence. *Id.* 445 U.S. at 230, 100 S.Ct. at 1115. This relationship must be one between the parties themselves. *Id.* at 231, n. 14, 100 S.Ct. at 1116 n. 14. Thus, plaintiff cannot hope to piggyback upon the duty owed by defendants to Morgan Stanley and Warner. There is no "duty in the air" to which any plaintiff can attach his claim.

Further support for this analysis comes from the following passage in *Chiarella, supra:*

> We know of no rule of law ... that a purchaser of stock, who was not an "insider" and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale.

*Id.* at 232, n. 14, 100 S.Ct. at 1116 n. 14. The duty to disclose arises from a relationship between the parties. Here, the defendants were not insiders of Deseret, had no fiduciary relation with Deseret's stockholders, and thus owed them no duty of disclosure. Consequently, there is no Section 10(b) damage liability of defendants to them.

Plaintiff asserts that the Southern District case of *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981), suggests a different conclusion. Plaintiff argues that *O'Connor, supra,* stands for theory that the fiduciary duty that traders owe to their corporation creates a separate duty to the investing public to disclose or abstain. There are several problems with relying on *O'Connor, supra.*

*O'Connor, supra,* can be distinguished on its facts. The plaintiffs there claimed that the information traded upon without disclosure had come from the issuer, the other party to the merger, or both. While the Court did not specifically state that its conclusion would differ if the information had not come from the insiders, it did base much of its analysis on the duty of insiders. Thus, the Court did distinguish *Chiarella, supra,* by noting that in *O'Connor, supra,* the alleged sources of material information were insiders. This supports a reading of *O'Connor, supra,* to apply only to the situation of information leaked from the issuer. Any other reading of the case would flatly contradict the language in *Chiarella, supra,* that states that a duty to disclose arises from a relation between the parties. *Id.* 445 U.S. at 231, n. 14, 100 S.Ct. at 1116 n. 14.

Plaintiff points to other alleged sources of a duty to disclose in addition to the duty to Morgan Stanley and Warner. Plaintiff claims that the negotiations between Warner and Deseret established a duty on the part of Morgan Stanley to disclose or abstain before trading and that this duty arose out of a duty that Warner owed to Deseret to bargain in good faith. If during the course of the bargaining leading up to the offer for the Deseret stock, Warner Lambert received confidential information from Deseret with the understanding that this information would be used by Warner only for legitimate corporate purposes, this could have imposed a duty on Warner not to abuse the information that it received. Morgan Stanley and its employees would then have been brought into a trust relation with Warner and thus could have become subject to the same duty owed to Deseret. If valid, this argument might allow plaintiff to prove that Courtois owed the sellers a duty arising out of the trust relationship of the bargaining process.

The most recent Second Circuit case on the question of the duty owed by an investment bank to a potential target when it represents the acquiring corporation is *Walton v. Morgan Stanley,* 623 F.2d 796 (2d Cir.1980). Morgan Stanley first represented Kennecott Copper Corporation while that corporation was considering the acquisition of Olinkraft. In the course of these negotiations, Olinkraft gave Morgan Stanley confidential inside information on the condition that Morgan Stanley use the information only in connection with its work on the Kennecott bid and that it then return the information to Olinkraft. The Kennecott bid did not materialize, but other companies did make bids for Olinkraft. Morgan Stanley's Arbitrage Department then purchased stock in Olinkraft. Morgan Stanley's Merger and Acquisitions Department, aware of the purchases by the Arbitrage Department, then used the confidential information to convince Johns-Manville to make a bid for Olinkraft.

Plaintiffs in *Walton, supra,* sued derivatively, claiming that Morgan Stanley had breached a fiduciary duty that it owed to Olinkraft. The Second Circuit rejected this argument. The Court stated:

> Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence in Morgan Stanley not to disclose the information, Morgan Stanley owed no duty to observe that confidence.

*Id.* at 799. The Court noted that facts had been presented to it to indicate that anything but an arm's length bargaining relationship had existed between Olinkraft and Morgan Stanley and Kennecott Copper.

*Walton* was based upon Delaware law as Olinkraft was a Delaware corporation. It is not possible to determine from the complaint and papers whether Deseret is a Delaware corporation or not. Note, however, that the Second Circuit's construction of New York fiduciary law results in a similar result. In *Frigitemp Corp. v. Financial Dynamics Fund,* 524 F.2d 275 (2d Cir.1975), the Court found that no fiduciary duty to a corporation had been created under New York law on the part of investment companies that had negotiated with the corporation regarding the purchase of corporate debt. As the negotiations had been at arm's length, no fiduciary duty had been created. The inside information that the investment companies had acquired could be traded upon.

Thus, unless plaintiffs can set forth facts that turn the negotiations from arm's length bargaining into a fiduciary relationship, they cannot claim that Morgan Stanley owed them a fiduciary duty. The plaintiffs assert that the following facts show that there was a fiduciary relationship:

1. The parties to the tender offer had negotiated for some time prior to the announcement.
2. Morgan Stanley had obtained some of its information directly from Deseret.
3. Deseret requested that trading in its stock be suspended upon the offer, thus showing that it wished the offer to proceed in an orderly manner.

These facts do not indicate any more of a duty on the part of Morgan Stanley than was present in *Walton, supra,* where there had been negotiations and a specific request by the target not to reveal the information. As the Second Circuit found that Morgan Stanley owed the target no duty in *Walton, supra,* this Court finds that no duty existed here.

Plaintiff also argues that Newman, as a registered broker-dealer breached an addi-

tional duty, that of a market professional to the market. Plaintiff relies on *Dirks v. S.E.C.,* 681 F.2d 824 (D.C.Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 371, 74 L.Ed.2d 506 (1982), for this theory. While it is true that *Dirks, supra,* did note that broker-dealers were subject to duties not imposed on the general public, this case cannot support an argument that the breach of a duty to the market creates a private cause of action. First, *Dirks, supra,* was an action to censure a broker-dealer. There was no discussion of what created a duty to disclose or abstain so as to give rise to Section 10(b) damage liability. Second, the information that Dirks failed to make publicly available before he passed it on to clients was inside information received from sources at the issuer.

Plaintiff has failed to state a claim on which relief may be granted under Section 10(b) of the Securities Exchange Act. In order to obtain damages for a violation of this Section, a plaintiff must show that a duty to disclose or abstain was owed by the defendants and that it has been breached. Plaintiff has not shown any duty owed to him by the defendants. They were outsiders of the corporation of which plaintiff was a stockholder. There was no fiduciary relationship of any nature between the parties. The only duty owed by defendants was that to Morgan Stanley and to Warner. Any effort to create a duty to plaintiff out of this duty contradicts the Supreme Court requirement that the duty giving rise to a violation of Section 10(b) arises out of a relationship between the parties.

*Section 14(e) Liability.*

Plaintiff also claims that Newman violated Section 14(e) of the Securities Exchange Act. Newman has moved to dismiss that complaint arguing that Rule 14e-3, which was adopted by the Securities and Exchange Commission on September 12, 1980, was the first effort by the Securities and Exchange Commission to make his actions illegal. As the actions involved in this litigation took place before the adoption of the Rule, Newman claims that his conduct did not violate Section 14(e).

■ Rule 14e–3 should not be given retroactive effect. The SEC Release accompanying Rule 14e–3 suggests that the SEC viewed the rule as altering the interpretation of Section 14(e) and as prospective in effect. *Tender Offer Fraud Rule,* 1934 Act Release No. 17120, Fed.Sec.L.Rep. [CCH] ¶ 82,646. This Release stated that "Rule 14e–3 *establishes* a 'disclose or abstain from trading' rule under the Williams Act," *id.* at 83,453 (emphasis added). Also, the Release stated that the Rule would be effective thirty days after the publication of the Release in the Federal Register. *Id.*

This language supports the finding that Rule 14e–3 was altering the interpretation of Section 14(e) and creating new liability. Before the adoption of the Rule, Section 14(e) could not cover the acts of defendants. The District Court that dismissed the indictment of Newman, *United States v. Courtois,* Fed.Sec.L.Rep. [CCH] ¶ 98.024 at 91,-292 (S.D.N.Y.1981) *rev'd on other grounds sub. nom. United States v. Newman,* 664 F.2d 12 (2d Cir.1981), noted that before Rule 14e–3 was adopted in 1980, the Williams Act had no "cure" for the problem of individuals trading on the basis of non-public information that a tender offer would be made.

Thus, as Rule 14e–3 cannot be given retroactive effect and as the Williams Act as interpreted before the Rule's adoption did not cover Newman's, Courtois' or Antoniu's acts, the Section 14(e) claim must be dismissed.

*Derivative Liability of Morgan Stanley.*

Plaintiff asserts that Morgan Stanley is liable derivatively for the Securities Acts violations of the individual defendants on theories of respondeat superior, aiding and abetting, and control person liability under Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). As the claims against the individuals have been dismissed, Morgan Stanley cannot be derivatively liable. Yet, it should be noted that the arguments that Morgan Stanley could be liable for any Section 10 or 14 violation are completely devoid of merit. Even if the underlying claims did state a claim on which

relief might be granted against the individual defendants, they would fall as against Morgan Stanley.

*Respondeat Superior.*

■ Plaintiff asserts that the common law doctrine of respondeat superior makes Morgan Stanley derivatively liable for the acts of its employee, Courtois. Plaintiff claims that the acts of an employee that are of the same general nature as, or sufficiently similar to, the authorized conduct will be adequate to impose derivative liability even if the acts are unauthorized. While it is correct that unauthorized acts can fall within the scope of employment and thus subject the employer to liability, the acts of Courtois cannot be so categorized.

As Judge Lasker noted in *O'Connor, supra* at 1194:

> [I]nsider trading and tipping cannot ordinarily [be] said to be within the course of employment. An employee who trades on the basis of material inside information or who tips cannot be said to act as an employee in the transaction.... [A]n employee who trades on the basis of insider information or who tips such information must normally be viewed as on a frolic of his own.

■ This analysis applies to Courtois. Like the employee in *O'Connor, supra,* the only link between the tip and the employment duties was that the latter constituted the source of the tip. The illegal trading did not take place on or use the facilities of the employer. No one dealing with the employee could have thought that the acts were authorized by the employer. The mere fact that the business of Morgan Stanley relates to securities generally is not sufficient to convert the acts of Courtois into acts within the scope of employment or acts similar in nature to authorized conduct. It is especially worthy of note that Courtois was employed in the Mergers and Acquisitions Department of Morgan Stanley. His usual responsibilities related to the analysis of potential targets and the structuring of deals, not to the purchase and sale of securities for his own or for anyone else's account. Thus, the acts for which the

plaintiff seeks to impose liability on Morgan Stanley were not of the same general nature or at all similar to authorized conduct.

The cases that plaintiff cites do not alter this conclusion. All of those cases involved acts that the employee undertook in his official capacity or that were the same type of activity usually undertaken. For example, in *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir.1973), a broker's acts were attributed to the employer as the broker had been dealing with the customers of the employer as its representative, thereby performing acts "commonly done" by brokers. *Id.* at 623.

Finally, plaintiff asserts that the fact that the illegal act of Courtois was foreseeable should make Morgan Stanley liable. Plaintiff relies on *Bushey v. United States*, 398 F.2d 167 (2d Cir.1968), for this test. In *Bushey, supra*, the employer, the United States, was held liable for the actions of a drunken seaman who destroyed a drydock as it was foreseeable that such damage would occur. The Second Circuit, however, was explicit in limiting its holding to situations in which there was some relation between the act of the employee and the activities of the enterprise. *Id.* at 172. Here, Courtois' actions had no relation to Morgan Stanley, as demonstrated above. Thus, under the *Bushey, supra*, test, Morgan Stanley is not derivatively liable for the acts of Courtois.

*Section 20(a) Liability.*

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), provides that controlling persons can be liable for the acts of controlled parties under certain circumstances. This Section states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

There is some uncertainty as to the construction of this Section in the Second Circuit. In *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973) (*en banc*), the Second Circuit stated that before liability could be extended to a controlling person under Section 20(a), there must be a showing of "culpable participation" by the party to be held liable. This test was followed in *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974). If it were clear that the Second Circuit is still following the test set forth in *Lanza, supra*, it would be proper to dismiss the claims on this ground against Morgan Stanley. There is no allegation of any act by Morgan Stanley that even approaches culpable participation, or even participation of any kind at all. Yet, the Second Circuit in *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), suggested that under certain circumstances inadequate supervision of employees may result in Section 20(a) liability. Thus, the Court stated that:

> While the precise standard of supervision required of broker-dealers to make good the good faith defense of Section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house ... and requires it to show at least that it has not been negligent in supervision ... and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel.

*Id.* at 716.

All that *Marbury Management, supra*, does to the Section 20(a) test is allow plaintiff to make out a prima facie case of control by a showing that the employee acted in the scope of his employment. Thus, in *Savino v. E.F. Hutton*, 507 F.Supp. 1225 (S.D.N.Y.1981), the Court stated that a prima facie showing of control could be made out by a showing that the employer had the means of control of the employee or

that there was some control by status. As Courtois was operating outside of the scope of his employment, there is no relationship between the parties to give Morgan Stanley control by status of Courtois with respect to the acts in question. Thus, no prima facie case of control can be made out under Section 20(a).

*Aiding and Abetting Liability.*

 There is also no liability on the part of Morgan Stanley as a result of plaintiff's argument that Morgan Stanley is liable as an aider and abettor of the defendants in this action. The Second Circuit test for aiding and abetting liability has recently been set forth by the Second Circuit in *IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909 (2d Cir.1980). The following must be shown before a defendant can be found to have aided and abetted:

1. The existence of a securities law violation by the primary party.
2. Knowledge of this violation by the aider and abettor.
3. Substantial assistance by the aider and abettor in the achievement of the primary violation.

The requirement of knowledge was further developed as follows:

When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.

*Id.* at 922. The requirement of substantial assistance has been defined to cover inaction by the defendant in certain limited circumstances. Liability will attach when there is clear evidence of some degree of scienter and a "conscious and specific motivation for not acting" or when there is a conscious or reckless violation of an independent duty to act. *Id.* at 927.

 Neither the second nor the third element of the aiding and abetting test is satisfied in this case. As Morgan Stanley had no duty of disclosure to anyone, the knowledge requirement can be met only if there is some conscious intent on the part of Morgan Stanley. No such allegation is made. All that plaintiff asserts is that Morgan Stanley may have been reckless. In addition to their failure to state any fact that can support a finding of recklessness as a matter of law, this argument fails as there can be no satisfaction of the second element of the complaint without a higher degree of scienter than recklessness.

There is also no allegation that can support a finding of substantial assistance. Plaintiff makes no claim that Morgan Stanley had any motivation at all for not acting. As matter of law there was no violation of any independent duty owing to plaintiff to act.

Thus, the attempt to find Morgan Stanley derivatively liable as an aider or abettor fails completely.

*RICO Claims.*

A. *Morgan Stanley.*

Plaintiff's Count II in the amended complaint charges Morgan Stanley, Inc. with culpability under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c).

The allegations of the amended complaint for this bold charge are the following:

Morgan Stanley rendered advice and assistance to Warner Lambert Company for a tender offer by it for Deseret stock (¶ 9). Morgan Stanley permitted an employee, one Courtois, to gain knowledge of and obtain access to confidential and privileged information pertaining to Warner's planned offer for Deseret stock (¶ 16). Courtois conspired with Antoniu and Newman to utilize to their personal advantage such privileged and confidential information and intentionally and knowingly defrauded plaintiff and class members who sold their Deseret stock at prices below the tender offer price subsequently announced (¶ 22). Morgan Stanley aided and abetted Courtois, Antoniu and Newman in this conspiracy; they failed adequately to supervise Courtois and recklessly and negligently failed to take steps to safeguard the confidential information and

are liable therefore as a person in control of Courtois and under common law principles of respondeat superior (¶ 23). Morgan Stanley's actions represent a pattern of [criminal] racketeering activity within the meaning of the Racketeer Influenced and Corrupt Organizations Act (¶ 27).

Plaintiff's brief opposing dismissal of the RICO count notes that Morgan Stanley has reacted with dismay and outrage to the charge associating it with criminal racketeering proscribed by the Racketeering Influenced and Corrupt Organizations Act.

Unless a plaintiff can point to a factual basis for a charge that a defendant is a member of a structured criminal organization with the requisite history of criminal racketeering acts or meets each of the elements requisite to establishing a RICO charge, civil litigation falls to the ground; indeed, such a charge infects the fundamental fairness of civil litigation.

The Racketeer Influenced and Corrupt Organizations Act, part of the Organized Crime Control Act of 1970, was designed in a multifaceted campaign against the pervasive presence of organized crime infiltrated in American business and trade. The preamble of the statute states its purpose: "To seek the eradication of organized crime in the United States . . . ." The Congress found that there was a drain by organized crime of billions of dollars from America's economy by illegal use of force, fraud and corruption; by syndicated gambling, loan-sharking, theft and fencing of property; by importation and distribution of narcotic and controlled drugs; by infiltration and corruption of legitimate business and labor unions. Pub.L. No. 91–452, 84 Stat. 922–23 (1970).

Congress did not define "organized crime." However, by its very nature, "organized crime" is not susceptible to a clear, concise definition. While organized crime brings to mind loansharking, drug dealing, and violent intimidation, it is neither these activities nor the individual or ethnic identity of the participants that separates organized crime from unspecified criminal activity. Entities engaging in organized crime are characterized by the existence of a well defined hierarchy and infrastructure. Organized criminal enterprises also employ numerous individuals whose jobs are to ensure that criminal activity can be carried out without interference from government agents or other competitors of the organization. This preclusion of interference is often accomplished by threat, bribe, or by actual physical violence. Additionally, organized criminal enterprises rely on internal, covert and often violent disciplinary measures for employees who act outside the scope of their authority.

The courts must facilitate the proper application of statutory causes of action and must guarantee that they are not abused and applied to contexts outside those intended by Congress. This is especially true in the civil context where the additional check and balancing factor of prosecutorial discretion is absent.

Courts have recognized that RICO claims could be proved only if there was a tie to organized crime. These holdings have been criticized because Congress did not explicitly require that racketeering activity be tied to organized crime. Indeed, Congress rejected an amendment to RICO designed to explicitly define organized crime because a "bright line" legislative definition might unconstitutionally create a status offense and because it would be easy for organized criminals to alter their conduct so that they would fall outside of the reach of the statute.

Legislative failure to establish a "bright line" does not imply that Congress intended that Courts repudiate their proper function of legislative interpretation and application. The Courts are routinely called on to apply general criteria on a case by case basis. This is especially true where the underlying subject matter is not well suited to simple definition. Thus, in obscenity and pornography cases, for example, Courts have limited the reach of anti-obscenity laws in light of Constitutional interests by employing

general criteria on a case by case basis.[1] Similar judicial action is appropriate in civil RICO cases.

The statutory language and recent Supreme Court and Second Circuit precedent, if carefully applied, can be extraordinarily effective in limiting RICO to its intended scope and filtering out many RICO claims that are just efforts to claim treble damages for ordinary violations of criminal or tort laws. For example, the requirement that the plaintiff show that the injury for which relief is sought resulted from a violation of Section 1962, and not simply from a violation of Section 1961, by the commission of the enumerated acts, eliminates from the scope of RICO the cases in which plaintiff seeks to use RICO to claim damages due to an inability to meet the requirements for relief stemming from predicate felonies.

 In addition, the requirement of *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), that the plaintiff must establish that the enterprise is an entity separate and apart from the pattern of racketeering activity makes clear that a violation of RICO is not set forth simply by alleging that the enumerated felonies of Section 1961 have been committed. If the enterprise that the plaintiff is relying upon is the criminal partnership of the defendants, the plaintiff must establish that there is something more to this partnership than the commission of the underlying felonies. For example, a developed infrastructure for the criminal partnership, used to help carry out its goals and enforce its aims, would suffice to give the group an adequate separate identity to meet the requirement of *Turkette, supra.* However, if all that the criminal partnership consists of is the commission of the requisite felonies, no violation of Section 1962 can be shown. Proof that the criminal partnership was an "on-going organization, formal or informal," with its associates functioning "as a continuing unit," *Turkette* at 583, 101 S.Ct. at 2528, will suffice to meet the enterprise requirement.

Criminal prosecution and civil remedies were authorized by RICO. The civil remedies provided in Section 1964 granted a private right of action to litigants injured by a violation of RICO's criminal provision, Section 1962, in addition to the injunctive remedies made available to the Attorney General to stamp out infiltration of legitimate business by divestiture and otherwise.

Section 1964(c) provides that:

[A]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

The proscribed activities under RICO are described in Section 1962 and enumerated in Section 1961. These are aimed at structured criminal organizations who fund, acquire or maintain enterprises engaged in or affecting interstate or foreign commerce with the proceeds of illegal activities by "(a)" investing income derived from a "pattern of racketeering" in an enterprise or "(b)" acquiring or maintaining an enterprise through "a pattern of racketeering," or "(c)" being employed by or associated with an "enterprise" to conduct or participate "in the conduct of such enterprise's affairs through a pattern of racketeering," or "(d)" to conspire to violate any of the foregoing. (Section 1962).

The statutory definition of a "pattern" of racketeering activity [Section 1961(5)] is "at least two acts of racketeering activity within ten years." "Racketeering activity" is any act of felony of the state or federal law listed in Section 1961(1).

 The use of the mails or the sale of securities are named as two of the methods by which the enumerated Section 1961 activities prohibited in Section 1962 may fall under the ban. The cardinal question at the threshold is whether there has been a commission of one of the enumerated pro-

---

1. Cf. *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stew-

art, J., concurring) ("I know it when I see it.").

hibited activities—one of the racketeering crimes in the course of organized crime defined by the RICO statute—which has caused injury to the plaintiff.

 RICO was thus established as a civil weapon against those engaged in organized crime who have gained an unfair competitive or financial advantage through criminal means associated with racketeering. The statutory offenses created by RICO were aimed at the evils of criminal racketeering by organized crime that had spread through the economy. *United States v. Turkette,* 452 U.S. 576, 589, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981). The sweep of the statute does not embrace ordinary violators charged in common law fraud actions or federal securities law violations as the predicate offenses for RICO relief, albeit the use thereof to accomplish one of the enumerated felonies in the statute may be an element of and lead to RICO liability if organized criminals engage in the prohibited activity.

The supporting civil remedies of the statute were designed against organized criminals and terrorists as an additional weapon in the crime fighters' arsenal.

 In other words, plaintiff's injury to be cognizable under RICO must be caused by a RICO violation and not simply by the commission of a predicate offense, such as mail fraud or federal securities fraud. RICO's civil remedy provision permits a recovery to "any person injured in his business or property *by reason of a violation of Section 1962,*" 18 U.S.C. Section 1964(c) (emphasis supplied), that is, where the distinctive RICO violation contributed to plaintiff's injury, i.e., where the plaintiff suffered directly a racketeering enterprise injury at the hands of those sought to be reached by the Organized Crime Control Act of 1970. *See* 116 Cong.Rec. 602, et seq.; 607, et seq.; 819, et seq.; 35201, et seq. (1970). The purpose was to provide "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Congressional Statement of Findings and Purposes, Pub.L. No. 91–452, § 1, 84 Stat. 922, 923.

It has appropriately been said:

The civil remedies provisions of RICO were not designed to convert every fraud or misrepresentation action involving corporations who use the mails or telephones to conduct their businesses in interstate commerce into treble damage RICO actions.

*Waterman S.S. Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La. 1981). *See also, Noonan v. Granville-Smith,* 537 F.Supp. 23 (S.D.N.Y.1981).

In civil litigation there is every reason why the application of RICO should be restricted sharply to organized crime and the enterprises on which its talons have fastened. Thus, courts in the Southern District and elsewhere have held that RICO claims for damages could be maintained only if there was a tie to organized crime. *Noonan v. Granville-Smith,* 537 F.Supp. 23, 29 (S.D.N.Y.1981), and *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109 (S.D.N.Y.1975). *See also, Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736 (N.D.Ill.1981); *Waterman S.S. Corp. v. Avondale Shipyards,* 527 F.Supp. 256 (E.D.La.1981).

Moreover, there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties. For example, it was clearly established at the time that RICO was enacted that there was no private right of action for violations of the mail fraud statute. It is implausible that Congress could have meant to alter this accepted rule to the extent of creating a right of action for treble damages without a single mention of such a revolutionary consequence anywhere in the legislative history.

 Plaintiff, on this motion for summary judgment, fails completely to satisfy the requirement that there be an underlying pattern of racketeering activity or even a single act of racketeering by Morgan Stanley. For these reasons alone, the RICO claim fails. Morgan Stanley is not principally charged with any substantive act that

could constitute even a single element of racketeering. In order to connect Morgan Stanley with a RICO claim, the plaintiff would have to establish facts which show derivative *criminal* liability as Section 1961 only defines acts to be racketeering if they are one of the enumerated felonies punishable under the laws of the United States.

 Note that even if the standard of proof is lower in a civil proceeding under RICO than in a criminal one, this does not relate to the elements of the crime but only to the burden that the plaintiff must bear in showing the elements. *Cf. United States v. Cappetto,* 502 F.2d 1351, 1357 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

 There is no claim herein that Morgan Stanley used its employees or anyone else to violate the Securities Exchange Act. None of the employees complained of made any investment in Morgan Stanley. To the contrary, Morgan Stanley was harmed by Courtois' and the other defendants' actions as its reputation as a safe repository for clients' secrets was diminished. In addition, in order to carry out his acts, Courtois had to circumvent Morgan Stanley's confidentiality controls and had to trade secretly on an outside account. There is no possible argument that Morgan Stanley is criminally liable for the acts of anyone by reason of Section 20(b) of the Securities Exchange Act, 15 U.S.C. Section 78t(b). That section has been construed as requiring a showing that the controlling person [Morgan Stanley] knowingly used the controlled person to commit the illegal act. *Securities Exchange Commission v. Coffey,* 493 F.2d 1304, 1318 (6th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Nor, what plaintiff apparently would argue, is Morgan Stanley derivatively criminally liable under a theory of aiding and abetting. While plaintiff alleged in paragraph 23 of his complaint that Morgan Stanley aided and abetted Courtois, Antoniu and Newman in their criminal conspiracy, he has not alleged or shown any fact that can constitute criminal aiding and abetting. It is well-established that in or-

der to find a defendant guilty of aiding and abetting, the defendant must "in some sort associate himself with the venture ... participating in it as something he wished to bring about [and] seeks by his action to make it succeed." *United States v. Clemente,* 640 F.2d 1069, 1079 (2d Cir.) *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981), citing *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938). In addition, an aider and abettor must have some interest in the criminal venture. Thus, "the mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere negative acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting." *United States v. Stanchich,* 550 F.2d 1294, 1300 (2d Cir.1977).

 Clearly, there has been no allegation and no fact asserted to suggest that Morgan Stanley in any way associated itself with the activities of the individual defendants. There was no participation by Morgan Stanley. Instead, all of Morgan Stanley's acts operated to deter the conspirators and make the accomplishment of their goal more difficult. Plaintiff has only alleged that Morgan Stanley was negligent or reckless in aiding and abetting. As noted above, no fact has been asserted that can constitute recklessness as a matter of law. Even if such an allegation were supported, such a state of mind would be inadequate along with inaction to constitute criminal aiding and abetting.

Even if a standard of civil derivative liability were adopted, which it is not, then Morgan Stanley still could not be derivatively civilly liable for anyone's acts in this case for the reasons stated above with respect to civil derivative liability for the underlying security counts.

Finally, plaintiff does not satisfy either the requirement that there be an underlying pattern of racketeering activity or that there be an enterprise as required by Section 1962 with an independent economic existence from the pattern of racketeering activity.

■ The provisions of Section 1962(c) require two separate elements in addition to the elements of causality and an underlying pattern of racketeering activity. There must be an enterprise and there must be some nexus between the pattern of racketeering activity and the enterprise. In *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1980), the Supreme Court stated that:

> "The enterprise" is not "the pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the government.

■ Thus, the enterprise must have a separate economic existence from the pattern of racketeering activity. *Bennett v. Berg,* 685 F.2d 1053, 1060 (8th Cir.1982). The test for the essential relationship is defined in *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981):

> One conducts the activities of an enterprise through a pattern of racketeering activity when (1) one is enabled to commit the predicate offenses *solely* by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise. [Emphasis added.]

■ The plaintiff contended in open court that the enterprise in the RICO claim against Morgan Stanley is the group of Newman and his associates. This claim fails to meet the requirement of *Turkette, supra,* that the enterprise have independent economic significance from the pattern of racketeering activity. Under this analysis, Morgan Stanley's pattern of activity would be identical to the enterprise. As there is no other organization, or group or individual that could possibly satisfy the enterprise requirements, including the *Scotto* test, the plaintiff completely fails to make out this element of a RICO claim.

### B. *Newman.*

■ Plaintiff's effort to state a claim against Newman is insufficient to warrant relief and withstand his motion to dismiss pursuant to Rule 12(b)(6). Plaintiff rests his argument that Newman is liable in treble damages for a violation of RICO on the mere fact that Newman has been convicted of violating some of the statutes listed in Section 1961. This assertion wholly distorts both the language of the statute and congressional intent in its enactment. As previously noted, RICO does not create a treble damage remedy for violations of the mail fraud statute. Nor does it create such a remedy whenever plaintiff alleges a violation of a Securities Act. Otherwise, the same allegations that the Supreme Court has held do not state a claim because of a failure to show a breach of duty to disclose, *Chiarella, supra,* or deception, *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), or standing, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), or scienter, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), could give rise to an action for treble damages by the plaintiff's reference to the RICO statute.

Instead, Section 1964(c) is clear in its requirement that plaintiff's injury to be cognizable under RICO must flow from the RICO violation, not simply from the commission of an enumerated felony. RICO's civil remedy provision permits a recovery to any person injured in his business or property *by reason of a violation of Section 1962,* 18 U.S.C. § 1964(c) (emphasis supplied), that is, where the distinctive RICO felony caused plaintiff's injury, i.e., where the plaintiff suffered proximately a racketeering enterprise injury at the hands of the defendant. It is inadequate merely to assert that damages were caused by commission of the underlying felony acts. *Harper v. New Japan Securities,* 545 F.Supp. 1002 (C.D.Cal.1982). Plaintiff's alleged injury did not result from an enterprise created or supported ‚by the fruits of a pattern of racketeering, from an enterprise controlled by racketeers, or from a pattern of racket-

eering activity carried on in association with an enterprise (prerequisites of Section 1962). Nor was the injury causally connected with a felony enumerated in Section 1961.

Plaintiff's loss of an opportunity for additional profits stemmed from his decision to sell Deseret stock the day before a tender offer for this stock was announced by Warner Lambert. Plaintiff's decision to sell was not induced by any act of the defendants. The subsequent rise in the price of Deseret stock was the consequence of Warner Lambert's tender offer, which occurred subsequent to the sale. The plaintiff's sale was not timed by any act of the defendants. Even if the on-going accumulation of funds by Newman, Courtois and Antoniu enabled them to purchase Deseret stock, this undisclosed activity in no way restrained or catalyzed the plaintiff's decision to sell his stock shortly before the announcement of a price increase.

Thus, as plaintiff has not alleged any injury that flowed from a violation of Section 1962, as required by the statute, the motion of defendant Newman to dismiss the RICO count must be granted.

*Summary Judgment is Appropriate Here.*

■ Plaintiff has correctly argued that the well-pleaded allegations of the complaint must be accepted as true and all reasonable inferences flowing therefrom must be construed in favor of the plaintiff on the motion pursuant to Rule 12(b)(6). It is also true that the motion for summary judgment may be granted if, as appears here, the record demonstrates that there are no genuine issues of material fact to be tried.[2] As a diversionary statement, plaintiff suggests that it has not yet had an opportunity to pursue the necessary discovery to develop its claims against Morgan Stanley. Plaintiff mentions a possible exploration of the reasonableness of Morgan Stanley's "security program and its possible awareness of the long-lived scheme of its employees." Finally, plaintiff argues that

it is not bound by the view of the government in the criminal case that Morgan Stanley was a "victim" of the scheme.

■ Plaintiff may not escape his obligation to go forward with any actually needed discovery with which to meet a motion for summary judgment. Plaintiff was duly tendered but waived such discovery, if indeed there was any useful purpose to be served by it. No claim to such a need was voiced at the hearing of the motion.

On September 21, 1982, two and one-half months before the return date of the motions, the parties met with the Court at a pre-trial conference. It was then agreed that the motion for summary judgment to bring to a head the question of the existence of genuine litigable issues would be made and that before hearing the plaintiff would be afforded whatever discovery plaintiff deemed necessary to defend the amended complaint. Immediate documentary discovery was provided by Morgan Stanley and no additional documentation was requested. Plaintiff was asked—repeatedly—and their requests were confirmed on October 1, 1982, two months ago, to designate any witness or witnesses connected with Morgan Stanley for deposition. No request for any deposition of anyone was made by the plaintiff. Indeed, the plaintiff did not even respond to the defendant's offers of witnesses. It is a fair inference in the circumstances on the basis of the affidavits submitted by Morgan Stanley and their challenging effect and the background of this case that discovery would demonstrate cogently the absence rather than the presence of genuine issues of material fact on either the securities claim or the RICO claim.

No law can be cited which warrants denial of summary judgment simply because the plaintiff has deliberately failed to conduct discovery.

The Court is amply justified in finding and concludes that plaintiff has declined the

---

**2.** Once the Court decides to accept matters outside the pleading, it must convert the Rule 12(b)(6) motion to dismiss into one for summary judgment. Wright and Miller, *Federal Practice and Procedure*, § 1366, p. 679, n. 66.

opportunity to depose Morgan Stanley and has chosen instead to stand on the unsupported allegations of the amended complaint, claiming that these allegations and the "questions" plaintiff's counsel now raises are enough to preclude summary judgment.

Rule 56(e) of the Federal Rules of Civil Procedure provides that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

When these sentences were added to Rule 56 in 1963, the Advisory Committee noted that:

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.

Advisory Committee Note, Proposed Amendments to Rules of Civil Procedure for the United States District Courts, 31 F.R.D. 648–49 (1962).

As Judge Friendly has stated:

When the movant comes forward with facts showing that his adversary's case is baseless, the opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts.

*Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir. 1972). *See also, Schneider v. McKesson & Robbins, Inc.,* 254 F.2d 827, 831 (2d Cir. 1958). The law in this Circuit is clear that even where there are allegations of fraud, "summary judgment cannot be defeated by the vague hope that something may turn up at trial." *Perma Research & Development Co. v. The Singer Company,* 410 F.2d 572, 578 (2d Cir.1969).

There is no reason why in this case the Rules which fully warrant an adjudication as to all defendants should not be applied.

The amended complaint is dismissed and judgment is to be entered in favor of the defendants against the plaintiff, with costs.