Hildegarde Badenhausen KING, Otto A. Badenhausen Jr., Walter Badenhausen, Otto Peter Badenhausen, Michael Badenhausen, Dorothea S. Badenhausen, Henry Wesselman III, J.P. Christopher Wesselman and William M. Lefevre as Trustee for Hildegarde Badenhausen King, Plaintiffs,

v.

Jeanne See LASHER, Alfred W. Lasher, Jr., E. Lisk Wyckoff, Jr., Kelley Drye & Warren (a partnership), John(S) Doe, Jane(S) Doe, and Jeanne See Lasher as Fiduciary of the American and Bahamian Estates of Hildegarde W. Badenhausen and of the Azura Chemical trust, Defendants.

No. 82 Civ. 8606 (HFW).

United States District Court, S.D. New York.

Aug. 16, 1983.

---

Ryan & Silberberg, New York City, for plaintiffs by Gerald E. Fogerty, Jill R. Botway, New York City.

Shea & Gould, New York City by Ronald H. Alenstein, John Paul Fulco, New York City, for the Lashers.

Kelley, Drye & Warren, pro se and representing defendant E. Lisk Wyckoff, Jr. by Richard J. Concannon, Robert E. Crotty, Kevin J. Walsh, New York City.

## MEMORANDUM DECISION

WERKER, District Judge.

This action was commenced under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. The case is before the court on the defendants' motion to dismiss the complaint.

On January 21, 1983, defendant Kelley Drye & Warren (Kelley Drye) moved on behalf of all defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) and for other relief. At a conference held in chambers on January 28, 1983, the court

ruled that it would treat the defendants' motion to dismiss as a motion for summary judgment and allowed plaintiffs 30 days to conduct discovery. Since that time, the law firm Shea & Gould has been substituted as counsel for defendant Alfred W. Lasher, Jr. and for defendant Jeanne See Lasher, individually and in her fiduciary capacities. Subsequently, Kelley Drye submitted additional affidavits and memoranda on behalf of it and defendant E. Lisk Wyckoff. Shea & Gould submitted a memorandum of law on behalf of the Lashers and the plaintiffs also submitted additional papers.

### Background

Defendant Jeanne See Lasher was the niece of Hildegarde Badenhausen (Mrs. Badenhausen). During her lifetime, Mrs. Badenhausen placed certain of her assets in a revocable *inter vivos* trust, called the Azura Chemical Trust (the Azura Trust) and named Jeanne See Lasher, as co-trustee, with her of the Azura Trust. Mrs. Badenhausen died on January 24, 1980, and since then, Jeanne See Lasher has served as the sole trustee of the Azura trust. Affidavit of E. Lisk Wyckoff, sworn to January 19, 1983, ¶¶ 4–7.

Mrs. Badenhausen also owned property in the United States and in the Bahamas and executed two wills—one disposing of all her property located in the Bahamas (the Bahamian Will) and a second will (the American Will) disposing of all of her other assets. Mrs. Badenhausen appointed Jeanne See Lasher the sole Executrix under both wills and appointed Jeanne's husband, Alfred W. Lasher, as her successor, if Mrs. Lasher were in any way incapacitated. Mrs. Lasher has qualified as Executrix and serves presently in that capacity. The American Will was admitted for probate in the Surrogate's Court of New York County on February 1, 1980. The Bahamian Will was filed in the Supreme Court of the Bahamas on or about February 2, 1980. (Wyckoff Aff. ¶ 5) (Bahamian Will ¶ 4, American Will ¶ 14).

Following Mrs. Badenhausen's death, Mrs. Lasher retained defendant E. Lisk Wyckoff, a member of the law firm of Kelley Drye & Warren, to advise her in the administration of the Decedent's estate, which had a gross date of death value of about $6,300,000 (Complaint ¶ 32). Mr. Wyckoff had acted as decedent's attorney since 1977 and had drafted both wills and the trust agreement setting up the Azura Trust (Complaint ¶ 13).

The assets of the Bahamian Estate, following administration, are to be distributed in 13 shares, 12 shares to individuals, and one to a trust for Hildegarde Badenhausen King, Decedent's adopted daughter and a plaintiff in this action (Wyckoff Aff.Ex. B). The residuary assets under the American Will are bequeathed or "poured over" into the Azura Trust, which in turn has the same 13 beneficiaries (Wyckoff Aff.Exs. A and C).

The assets of both the American Estate and the Bahamian Estate have the same single administrator, Mrs. Lasher, and the same 13 residuary beneficiaries. As the complaint alleges (¶ 22), it was the intention of Decedent that her assets, after her death, be administered in conjunction with each other.

Plaintiffs include eight of the beneficiaries of the Azura Trust and William M. LeFevre. Mr. LeFevre, the only non-beneficiary plaintiff, is a stockbroker who performed recordkeeping functions for Decedent. He was authorized to have access, and did have access, to Decedent's safe deposit box and the safe deposit box held by the Azura Trust (Wyckoff ¶ 15). In 1979, the Decedent executed a general power of attorney in favor of Mr. LeFevre.

After Mrs. Badenhausen's death, Mr. LeFevre entered Decedent's house in New Jersey. This entry was made even though LeFevre's power of attorney from Decedent had terminated as of her death. During this unauthorized entry, Mr. LeFevre was accompanied by Gerald Fogerty, who is the attorney for the plaintiffs in the instant action. (*Id.* ¶ 15).

Under the terms of the American and Bahamian Wills and the Azura Trust, Mrs. Lasher was given broad discretionary pow-

ers to carry out her duties in administering Decedent's estate (Bahamian Will, ¶¶ 9–13; American Will ¶ 12). The Trust Agreement provides:

[The Trustees shall have the power to:] ... in their discretion ... do all acts ... and exercise all rights and privileges which could be done ... or exercised ... if they were the absolute owners of such property, including, but not by way of limitation, power and authority, in their discretion ...

(A) to retain any such property for such length of time as they shall deem advisable, ...

\* \* \* \* \* \*

(C) to sell and convey at public or private sale, to lease for any term ... exchange, dispose of, and generally to deal with, any such property at such time or times, and on such terms and conditions, ... as they shall deem advisable;

(D) to invest and reinvest any money at any time forming a part of the trust estate in any securities or other property, real or personal, of whatever kind and wherever located, ...

(E) to manage any real property at any time forming a part of the trust estate in the same manner as if they were the absolute owners thereof;

Ex. C to Wyckoff Aff., ¶ 6; Ex. A to Wyckoff Aff., ¶ 12.

As Executrix, under the American Will Mrs. Lasher was granted broad discretionary power. (Ex. A to Wyckoff Aff.) Under the Bahamian Will, the Executrix has similarly broad powers. (Ex. B to Wyckoff Aff.)

Following Mrs. Badenhausen's death, Mrs. Lasher began administering and liquidating the Badenhausen Estate. Included in the Estate's assets were Mrs. Badenhausen's estate in Morris Township, New Jersey known as Hilsfarm, Decedent's residence in the Bahamas, known as Moongate, extensive personalty and jewelry at each house, and stocks, bonds and currency in various safe deposit boxes. (See Intermediate Accounts, Exs. G and H to the Wyckoff Aff.)

On September 9, 1981, Mr. LeFevre purportedly acting as Trustee for Hildegarde Badenhausen King, commenced an action in federal court in the Southern District of New York against Mrs. Lasher as trustee of the Azura Trust. (81 Civ. 5630 (CSH)). The complaint in that action sought, among other things, an accounting from Mrs. Lasher, her removal as Trustee of the Azura Trust and restoration to the Estate of allegedly wrongfully taken property. (See Ex. D to the Wyckoff Aff.) The present complaint (like the first complaint) alleges that Mr. LeFevre is a trustee of a trust established under Mrs. Badenhausen's American Will for the benefit of Mrs. Badenhausen's adopted daughter. It appears undisputed that Mr. LeFevre has never qualified as Trustee, and accordingly has no standing here. (Wyckoff Aff. ¶ 11.)

Mrs. Lasher moved to dismiss the September 1981 complaint on the primary ground that the issue of the disposition of the estate and trust property was properly within the jurisdiction of the Surrogate's Court, New York County. (Wyckoff Aff. ¶ 12). Mr. LeFevre apparently did not contest Mrs. Lasher's motion to dismiss. In a letter to an attorney at Kelly Drye, Mr. Fogerty, counsel to Mr. LeFevre in the first federal action, wrote: "[T]he primary goal of this litigation, ... is to marshal, for eventual distribution to the remaindermen under the Azura Chemical Trust and the Bahamian Will of the decedent, all of the assets of the decedent which are properly so distributable." (Letter dated January 4, 1982 from Gerald Fogerty to Richard Donovan of Kelly Drye & Warren attached to Wyckoff Aff. as Ex. F).

On February 2, 1982, Mrs. Lasher filed a Petition to Settle Account and For a Preliminary Accounting in the Surrogate's Court, New York County. Along with that petition she filed a First Intermediate Account of Proceedings as Executrix and Intermediate Account of Proceedings of Surviving Trustee. The accounts detailed her stewardship of the Badenhausen Estate

and the Azura Trust. (Wyckoff Aff., Exs. G and H.)

On February 10, 1982, Mr. Fogerty, representing Mr. LeFevre, agreed to a dismissal without prejudice of Mr. LeFevre's first federal action. The stipulation and order dismissing the first federal action recognized that the accounts filed by Mrs. Lasher covered the purported claims raised in the September 1981 complaint:

> ... [the accounts] raised the issue whether the assets referred to in the first through fourth claims of the [September 1981 Complaint] are the property of the Estate of Hildegarde W. Badenhausen or of the Azura Chemical Trust and contained an information schedule of the assets of the Bahamian Estate of Hildegarde W. Badenhausen....

Stipulation and Order dated February 19, 1982, attached as Ex. I to Wyckoff Aff.

In addition to the Petition to Settle Account and her two Intermediate Accounts, Mrs. Lasher also filed in Surrogate's Court, New York County, in January, 1982, a Petition to compel Mr. LeFevre to account for his acts as fiduciary to the Decedent, as well as a Petition to compel Mr. LeFevre to turn over documents and appear for a deposition. (Wyckoff Aff. ¶ 15). Apparently, Mr. LeFevre had provided certain of Decedent's financial records to Mrs. Lasher's attorneys, but there appeared to be areas in which he had acted as Decedent's fiduciary for which no records had been produced. (See ¶ 15 and Ex. J to the Wyckoff Aff.)

Following the filing of the Intermediate Accounts, Mr. Fogerty took Mrs. Lasher's deposition in the pending accounting proceeding at the Surrogate's Court in May 1982. (Wyckoff Aff. ¶ 17). During the deposition, Mr. Fogerty questioned Mrs. Lasher with respect to her Accounts, the items listed in the September, 1981 complaint and various other items of Decedent's property. (Wyckoff Aff. ¶ 16–17.)

The instant action was commenced on December 27, 1982. The alleged claim for damages is pleaded as a civil treble damage action under RICO.

## I.

The issue in this case is not whether claims exist against the defendants but whether there are such claims which belong in federal district court. Essentially the complaint presents a dispute between certain beneficiaries of an estate and trust and their fiduciary concerning the ownership of certain property which plaintiffs allege belongs to the estate or trust and has been converted by the defendants. These allegations are the subject of a pending proceeding before the New York County Surrogate's Court since they must be raised as objections to the accounting already filed there.

RICO was enacted as part of the Organized Crime Control Act of 1970. In *United States v. Ivic,* 700 F.2d 51, 63 (2d Cir.1983), the Second Circuit stated:

> In sum, RICO is the lineal descendant of a pair of 1967 Senate bills designed to apply antitrust-type measures to the problem of "black money". Although the bill ultimately enacted as RICO went somewhat beyond this initial conception, preventing and reversing the infiltration of legitimate businesses by organized crime elements remained its core purpose.

RICO contains both civil and criminal penalties for a violation of its provisions. The civil remedies set forth in § 1964 provide a private right of action to persons injured by a violation of § 1962. Section 1964(c) provides:

> [A]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Under Section 1962, the following acts are prohibited by RICO: (a) the acquisition or operation of an enterprise with income derived from a pattern of racketeering activity; (b) the acquisition or maintenance of an interest in or control of an enterprise through a pattern of racketeering activity; (c) the conduct of or participation in the

conduct of the affairs of an enterprise through a pattern of racketeering activity by a person employed by or associated with the enterprise; and (d) the conspiracy to do any of the above acts. 18 U.S.C. § 1962. The definition of a pattern of racketeering activity, section 1961(5), is "at least two acts of racketeering activity . . . within ten years." The definition of "racketeering activity" in Section 1961(1) includes a number of federal offenses and eight state crimes. Section 1962 does not proscribe acts defined as racketeering activity in Section 1961 of the statute. Those acts are punishable under state and federal law.

The defendants contend that the complaint fails to state a claim for relief under RICO because the plaintiffs have not alleged injury from a violation of section 1962. The defendants argue that if plaintiffs have sustained an injury their injury arises only from the alleged acts of fraud committed by the defendants, which is not the type of injury that is cognizable in a civil RICO action.

District Courts have recognized that state law claims are not properly converted into federal treble damage actions by simply alleging that wrongful acts are a pattern of racketeering related to an enterprise. Plaintiffs must also allege injury resulting from the purported RICO violations. 18 U.S.C. § 1964(c). In this case, the existing assets referred to in the complaint have been accounted for or otherwise disclosed and, therefore, plaintiffs can claim no injury. In any event, the plaintiffs have alleged no injury cognizable under RICO. Any alleged injury resulted from the predicate acts, i.e., the alleged misappropriation, conversion or theft of property. (Complaint, ¶ 169).

■ To state a claim under RICO, the injury which triggers RICO must be something more than the injury resulting from the alleged underlying predicate crimes and must be connected to the objective of the statute, which is operation or acquisition of an enterprise through a pattern of racketeering. Here, plaintiffs' only alleged injury is the loss of Estate or Trust property resulting from the alleged predicate crimes. (The Wyckoff affidavit and the exhibits submitted by defendants demonstrate that there has been no loss of Estate or Trust assets.) No additional injury, resulting from the operation or acquisition of an enterprise through alleged racketeering acts, is set forth in the complaint.

■ In this action, beneficiaries' claims against a fiduciary in a trust and estate dispute already pending in Surrogate's Court, New York County, are being twisted to convert them into a dispute alleging mail fraud and interstate transportation of stolen goods as part of a "pattern of racketeering activity" by the fiduciary, her husband and her lawyer. RICO was intended for no such purpose.

In *Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1361 (S.D.N.Y.1983), Judge Pollack stated:

[P]laintiff's injury to be cognizable under RICO must be caused by a RICO violation and not simply by the commission of a predicate offense, such as mail fraud or federal securities fraud. RICO's civil remedy provision permits a recovery to "any person injured in his business or property by reason of a violation of Section 1962," 18 U.S.C. Section 1964(c), that is, where the distinctive RICO violation contributed to plaintiff's injury, i.e., where the plaintiff suffered directly a racketeering enterprise injury at the hands of those sought to be reached by the Organized Crime Control Act of 1970.

*See also Bulkferts Inc. v. Salatin Inc.*, 574 F.Supp. 6 (S.D.N.Y.1983); *Harper v. New Japan Securities International*, 545 F.Supp. 1002 (C.D.Cal.1982); *Alton v. Alton*, No. 82 Civ. 0795, slip op. (S.D.N.Y. July 9, 1982).

In *Richardson v. Shearson/American Express Co., Inc.*, 573 F.Supp. 133 (S.D.N.Y. 1983), this court stated that it was not of the opinion that a defendant's association with organized crime was an essential element of a civil RICO claim. However, it went on to say "for many of the reasons

relied upon by Judge Pollack in *Moss,* the court agrees that the only injury that may be redressed in a civil RICO suit must result from a violation of section 1962." *Id.* at 9–10.

Plaintiff's claim here is a claim against the Executrix/Trustee, her husband and her lawyer for alleged misappropriation of assets and alleges only injuries resulting from the predicate acts. *See, e.g.,* Plaintiff's reply memorandum at 7. The complaint fails to allege an injury arising from a violation of section 1962.

Here, plaintiffs have a perfectly proper monetary remedy in the proceeding now pending in the Surrogate's Court which would afford them complete relief on proof of the same alleged facts which underlie this federal action. Surcharges can be awarded, if appropriate, in the accounting proceeding in the New York County Surrogate's Court. Further, the initial factual determination to be made, i.e., whether the allegedly misappropriated property belongs to the estate, is a determination which is peculiarly within the expertise of the Surrogate's Court. *See* Reply Memorandum of Law submitted by Shea & Gould on behalf of the Lashers, at 23.

## II.

As a predicate to stating a RICO claim, plaintiffs must allege that defendants engaged in two or more acts of "racketeering activity" as defined in § 1961(1). The complaint does not allege the intent necessary for an indictable offense under the predicate crimes.

Plaintiffs assert as "racketeering activity" that defendants have transported stolen property across state lines in violation of 18 U.S.C. § 2314. Paragraph 30(a) of the complaint incorporates those acts alleged in the complaint to be indictable as acts of transporting stolen goods across state lines.

As a second set of underlying acts of racketeering, plaintiffs allege a series of acts which purportedly amount to mail fraud under 18 U.S.C. § 1341. The complaint alleges that the defendants committed mail fraud by submitting invoices which wrongfully or by false invoice billed the Estate for Mr. Lasher's expenses (Complaint ¶¶ 138–149), by falsely representing to the Internal Revenue Service that the estate did not have sufficient cash to pay the full Federal Estate Tax due in October, 1980 and requesting additional time to pay $340,000 in taxes and by filing a false tax return. (Complaint ¶ 157–159)

Plaintiffs fail to plead that these items have been accounted for or otherwise disclosed by Mrs. Lasher so that there has been no hidden retention of property. Their attempt to fashion from these facts the federal crime of transporting stolen goods is unsupportable.

 To state a violation of 18 U.S.C. § 2314 plaintiffs must allege that defendants knew that the property which was transported in interstate commerce was stolen. *United States v. Wabaunsee,* 528 F.2d 1 (7th Cir.1975). To allege mail fraud under 18 U.S.C. § 1341, plaintiffs must allege that each defendant knowingly and intentionally participated in a scheme to defraud victims by false pretenses or representations knowingly or intentionally made by the defendants. *United States v. Pearlstein,* 576 F.2d 531 (3d Cir.1978).

The allegations of the complaint do not properly plead predicate acts under RICO because the alleged facts could not support a finding of the necessary criminal intent. The complaint alleges that foreign currency was stolen from Decedent's safe deposit box (Complaint ¶ 37), that items were taken from Hilsfarm in the Mercedes Benz (Complaint ¶¶ 90, 94–95, 99–100, 102–103, 121–122, 126–129) and that certain other items were allegedly taken from Hilsfarm (Complaint ¶¶ 85–86, 106, 110–111, 114–115, and 117–118). Assuming the truth of the facts pled by plaintiffs, there is alleged no knowing transportation of stolen goods in violation of 18 U.S.C. § 2314.

Mrs. Lasher has been the only trustee of the Azura Trust and the Executrix of the Decedent's Estate. (Complaint ¶ 4, 14). There is no allegation that Mrs. Lasher was improperly appointed or is not the Execu-

trix and Trustee. Both the American Will and the Azura Trust empower Mrs. Lasher to treat this property "as if [she] were the absolute owner of such property." (Wyckoff Aff., Ex. A, p. 8, Ex. C, p. 23).

Without more, the simple allegation that Mrs. Lasher took estate or trust property to Houston, combined with the conclusory allegation that the property was "stolen", fails to state a crime under Section 2314 because the items were in the possession of a lawful fiduciary. (Complaint ¶ 80–103, 109–130).

■ Under New York law, an executor is the legal owner of estate property. *In re Chisholm's Estate,* 177 Misc. 423, 425, 30 N.Y.S.2d 870, 873 (Surr.Ct., Kings Cty. 1941), *aff'd,* 264 A.D. 793, 35 N.Y.S.2d 212 (2d Dept.1942), *aff'd,* 290 N.Y. 842, 50 N.E.2d 239 (1943); *In re Schwarzmann's Estate,* 174 Misc. 834, 835, 21 N.Y.S.2d 912, 914 (Surr.Ct., Kings Cty.1940). Mrs. Lasher was also acting as Trustee of the Azura Trust and had legal title to all of the trust property. It appears that all of the property (with the exception of the foreign currency) that Mrs. Lasher is alleged to have transported over state lines was Trust property. The Trust Agreement provides that the Trustee may "continue to exercise, until actual distribution of the trust fund has been completed, any and all powers and authorities, discretionary and otherwise, conferred upon them by this Article." (Ex. C to the Wyckoff Aff., Article Sixth (F), p. 25.)

It is undisputed that Mrs. Lasher was properly appointed Executrix and Trustee. The alleged facts do not support a finding that Mrs. Lasher knew the property was stolen when she transported it to Houston. The claim that Mrs. Lasher gave away to other beneficiaries certain of the Trust property (the Azura guns, the silver tea service and the jadeite jewelry) also defeats any conclusion of wrongful intent. (Complaint, ¶ 106–108)

Although the complaint includes a number of claims concerning Mrs. Badenhausen's "denuded" safe deposit boxes in New York, (Complaint ¶ 33–47), plaintiffs' counsel fails to point out that the foreign currency has been returned to New York and that he has examined it. While the theft of the "stolen foreign currency" is cited as a RICO violation in ¶ 30(a) of the complaint, it is not included in the operative damages claim in ¶ 169 of the complaint.

The complaint alleges that Mr. and Mrs. Lasher misappropriated Decedent's Mercedes, valued at $8,700, (¶ 90). However, Meyers-Lasher, Inc. paid the Trust $9,975 for the car. The Trust account states this fact, and Mrs. Lasher testified to this in her deposition. However, the complaint does not refer to the purchase.

With respect to mail fraud, the allegations of the complaint do not support a finding that defendants knowingly participated in a scheme to defraud by false pretenses or representations knowingly made by the defendants. *United States v. Pearlstein, supra.* Plaintiffs do not dispute that Mrs. Lasher was validly empowered to act as sole Trustee of the Azura Trust and as Executrix under the American Will. Pursuant to the Trust Agreement, Mrs. Lasher as trustee was authorized to "employ such agents, assistants . . . as [she] shall deem advisable . . . and to make such payments to them as [she] deem[s] reasonable." Ex. C to Wyckoff Aff., ¶ 6(P).

Given this authority, the allegations that funds were wrongfully paid to Mr. Lasher from an "Account of the Trust" is not sufficient to withstand a motion to dismiss. Under the Trust Agreement, Mrs. Lasher had the authority to approve payment of Mr. Lasher's travelling expenses when he travelled with her on Trust business. Each of the payments to Mr. Lasher was listed on the Trust account and plaintiffs' attorney was given the supporting invoices. (The invoices are submitted as Exhibit P to the Wyckoff Affidavit.) As noted by the defendants, there may be a dispute over whether Mr. Lasher's expenses are properly chargeable to the Estate or the Trust, but there is not a "scheme or artifice to defraud" which used the mails to carry out its fraudulent purpose.

With regard to the extension for payment of certain taxes, Mrs. Lasher's actions were disclosed and her request for an extension of time to pay taxes was not a scheme or artifice to defraud which used the mails to carry out such a scheme. The request was within her powers as Executrix and Trustee.

The complaint does not allege that Kelley Drye and Mr. Wyckoff knew about the removal of the Hilsfarm items to Houston or knew about the alleged "falsity" of the invoices submitted for Mr. Lasher's expenses. Paragraph 165 of the complaint lists a number of items which were allegedly fraudulently omitted from the Estate's federal tax return. However, in paragraphs 166–167 of the complaint, plaintiffs allege that the Kelley Drye defendants were aware of only two of the items supposedly omitted. All of the items were disclosed to the Internal Revenue Service and in the accounts filed by Mrs. Lasher. Plaintiffs were not damaged by the filing.

Paragraphs 131–137 of the complaint allege that Mr. Wyckoff personally stole some of the Decedent's silver. These allegations do not support a claim under RICO. The complaint alleges only that the silver existed (Complaint ¶ 131), that Mr. Wyckoff took it from Hilsfarm (Complaint ¶ 132), that it is now missing (Complaint ¶ 134–135) and that Wyckoff stole it (Complaint ¶ 137). These unadorned allegations are insufficient under 18 U.S.C. § 2314 because they allege only that the items of silver are missing but state no facts to support the conclusion that Mr. Wyckoff took them. The Wyckoff affidavit, the affidavit of Leonard Adler, sworn to January 19, 1983, and the affidavit of William J. Doyle, sworn to January 14, 1983, make it clear that no items were taken. Each item listed in paragraphs 134–135 of the complaint was received and sold by the William J. Doyle Galleries, Inc. and the proceeds of that sale are now included in the Trust.

Assuming the truth of the facts alleged in the complaint, they are not sufficient to support a finding of the necessary intent under the prerequisite federal criminal statutes set forth in RICO.

### III.

■ There will be an award of attorneys' fees to the defendants against plaintiffs' counsel. Mr. Fogerty has omitted from the complaint relevant and indisputable facts within his knowledge. It is apparent that this action was commenced in bad faith without adequate factual basis. The complaint is just one more example of an abuse of a statute whose meaning and intent are clear. Since all of the questions addressed by the complaint can be disposed of in the Surrogate's Court, this court should abstain from further consideration of the matter. Counsel for the defendants should submit affidavits with respect to attorneys' fees on notice to counsel for plaintiffs.

### IV.

In accordance with the above, the defendants' motion to dismiss the complaint is granted. The complaint is dismissed in its entirety for failure to state a claim under RICO. The defendants are directed to submit a judgment on notice within 10 days after entry of this decision.

SO ORDERED.